1  David S. Kupetz (CA Bar No. 125062)
   *dkupetz@sulmeyerlaw.com*
2  Steven F. Werth (CA Bar No. 205434)
   *swerth@sulmeyerlaw.com*
3  Claire K. Wu (CA Bar No. 295966)
   *ckwu@sulmeyerlaw.com*
4  **Sulmeyer**Kupetz
   A Professional Corporation
5  333 South Grand Ave, Suite 3400
   Los Angeles, California 90071
6  Telephone: 213.626.2311
   Facsimile: 213.629.4520
7
8  Attorneys for Sandbox VR Ridge Hill, LLC
   and related debtors

9              **UNITED STATES BANKRUPTCY COURT**

10             **CENTRAL DISTRICT OF CALIFORNIA**

11             **SAN FERNANDO VALLEY DIVISION**

12  In re                              Case No.  1:20-bk-11440-MB

13  SANDBOX VR RIDGE HILL, LLC, a      Chapter 11
    Delaware limited liability company,
14                                     **EMERGENCY MOTION FOR ORDER
              Debtor.                  REJECTING LEASE WITH YONKERS
15                                     ASSOCIATES, LLC; MEMORANDUM
                                       OF POINTS AND AUTHORITIES;
16  Federal EIN:  83-2686743           DECLARATION OF STEVEN ZHAO**

17                                     Date:   [To Be Determined By Court]
                                       Time:   [To Be Determined By Court]
18                                     Place:  U.S. Bankruptcy Court
                                               Courtroom 303
19                                             21041 Burbank Blvd.
                                               Woodland Hills, CA 91367
20

21

22

23

24

25

26

27

28

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

SFW 2703103v1

001

**TO THE HONORABLE MARTIN R. BARASH, UNITED STATES BANKRUPTCY
JUDGE; THE OFFICE OF THE UNITED STATES TRUSTEE; AND ALL OTHER
INTERESTED PARTIES:**

<u>**EMERGENCY MOTION AND NEED FOR EMERGENCY RELIEF**</u>

Sandbox VR Ridge Hill, LLC a Delaware limited liability company, the debtor and debtor
in possession in the above-captioned case ("<u>Ridge Hill</u>"), respectfully requests the entry of an
order, substantially in the form attached hereto as Exhibit 1 (the "<u>Proposed Order</u>"), pursuant to
sections 105(a) and 365(a) of Title 11 of the United States Code (the "<u>Bankruptcy Code</u>")
authorizing Ridge Hill's rejection of the unexpired lease of nonresidential real property attached
hereto as Exhibit 2 (the "<u>Lease</u>") effective as of August 13, 2020, the date of commencement of
this bankruptcy case (the "<u>Petition Date</u>").  Yonkers Associates, LLC, a New York limited liability
company ("<u>Landlord</u>") is the counterparty to the Lease.

Ridge Hill has never occupied the premises that it leases pursuant to the Lease, which
premises are located at Unit 1030 of the Ridge Hill Shopping Center located at 247 Market Street,
Yonkers, New York 10710 (the "<u>Premises</u>").  Ridge Hill has no personal property at the Premises.
Additionally, the Landlord has never delivered the Premises to Ridge Hill.  Because Ridge Hill is
not utilizing the Premises, if the Lease is not terminated, Ridge Hill's Estate ("<u>Estate</u>") will
continue to incur administrative expenses in connection with the Lease.  This will provide no
benefit to the Estate, and will harm unsecured creditors of the Estate.

This motion is based on the attached Memorandum of Points and Authorities, the
supporting exhibits attached hereto, the attached declaration of Steven Zhao, and the arguments of
counsel to be made at the hearing on the Motion.

**FOR THESE REASONS**, Ridge Hill respectfully requests that the Court enter an order in
a form substantially similar to that attached hereto as **Exhibit 1**, and grant such other relief as the
Court deems proper.

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1

Dated:  August 13, 2020

Respectfully submitted,

2

**Sulmeyer**Kupetz
A Professional Corporation

3

4

5

By: _____/s/David A. Kupetz_____

6

David S. Kupetz
Steven F. Werth

7

Attorneys for Sandbox VR Ridge Hill, LLC and
related debtors

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

SFW 2703103v1

3

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.**

**BACKGROUND**

Ridge Hill is part of a single business enterprise, along with its parent, Glostation Core USA, Inc., a Delaware corporation ("Core"), Core's parent Glostation USA, Inc., a Delaware corporation, and eight other wholly-owned subsidiaries of Core.

On the Petition Date, Ridge Hill and ten other affiliated entities, including Core and Glostation USA, Inc., commenced Chapter 11 bankruptcy cases.  These eleven entities are referred to collectively as the "Debtors".   The Debtors are all part of a single business enterprise established to develop, operate, and franchise facilities offering full-body tracking, free roaming, virtual reality experiences for private groups (meaning no strangers can play together), operating under the name "Sandbox VR ™" (the "Business").  The website for the Business is www.sandboxvr.com.

Ridge Hill entered into the Lease for the purpose of opening a store so that the Debtors could offer this type of VR experience at the Premises.  However, the Coronavirus struck before Ridge Hill moved in to the Premises.  As a result, Ridge Hill was not able to open the store at the Premises, has never conducted business at the Premises, and has no personal property at the Premises.  Additionally, the Landlord has never delivered the Premises to Ridge Hill.  Now that the Coronavirus has made operation of all stores more difficult, Ridge Hill believes that continued use of the Lease is no longer a benefit to the Estate or its creditors.

Because Ridge Hill has never moved in to the Premises or operated its Business there, and the cost associated with doing so would be substantial (including installation of improvements, the purchase of equipment, the hiring of staff to operate the store, and the continued payment of rent which is $15,000 per month under the Lease), Ridge Hill determined that there is no benefit to continuing to make Lease payments.  The administrative burden of these payments will far exceed any benefit the Estate may otherwise receive from the store opening in the future.  As a result, Ridge Hill determined, in the exercise of its business judgment, that immediate closure of the Premises and rejection of the Lease is in the best interest of the Estate.

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

004

1    The Landlord is currently holding a deposit of Ridge Hill's in the amount of $45,012.50.

**II.**

**BASIS FOR RELIEF REQUESTED**

4    The primary goal of chapter 11 is rehabilitation of the debtor.  *See* NLRB v. Bildisco &

Bildisco, 465 U.S. 513, 104 S. Ct. 1188, 1197, 79 L. E. 2d 482 (1984).  In furtherance of this goal,

there is a long-standing principle of bankruptcy law that a debtor should not be compelled to

perform under a pre-bankruptcy contract that is burdensome to the estate.  *See* Id. at 1198 ("[T]he

authority to reject an executory contract is vital to the basic purpose of a chapter 11

reorganization, because rejection can release a debtor's estate from burdensome obligations that

can impede a successful reorganization").

11    Bankruptcy Code section 365(a) provides that, subject to court approval, a debtor in

possession "may assume or reject any executory contract or unexpired lease of the debtor."  11

U.S.C. §§ 365(a) and 1107(a).  Section 365(a) does not provide a standard for determining when

rejection of an unexpired lease is appropriate.  However, courts traditionally have applied a

"business judgment" standard in determining whether to authorize rejection of executory contracts

and unexpired leases.  *See* Bildisco at 523.  Accordingly, if the debtor in possession has

reasonably exercised its business judgment in determining to reject an executory contract, the

decision should be approved by the court.  *See* Robertson v. Pierce (In re Houng), 23 B.R. 798,

800 (9th Cir. 1982).

20    "As a general rule, a bankruptcy court presented with an application to disaffirm the

obligations of an executory contract need determine only whether it is indeed executory and

whether disaffirmance would be advantageous to the debtor."  In re Federated Department Stores,

Inc., 131 B.R. 808, 811 (Bankr. S.D. Ohio 1991).  Further, "[t]he burden or hardship which

rejection would impose on other parties to such a contract is not a factor to be weighed by the

bankruptcy court in ruling upon the debtor's application."  Id.  As applied to a debtor's decision to

reject an executory contract, it has been held that the business judgment test "requires that the

decision be accepted by courts unless it is shown that the [debtor's] decision was one taken in bad

faith or in gross abuse of the bankrupt's retained business discretion."  Lubrizol, 756 F.2d at 1047.

1    In exercise of its business judgment, Ridge Hill determined that rejection of the Lease is in

2   the best interests of the Estate.  The Lease relates to a business site that Ridge Hill and its affiliates

3   had never operated.  After analyzing the expenses that would have to be incurred in preparing the

4   Premises for business, Ridge Hill determined that continued payment of $15,000 per month to the

5   Landlord, with no guarantee that the Premises would generate profit in the future or could even

6   open for business, will only result in a burdensome administrative cost to the Estate.

7    For these reasons Ridge Hill, in the reasonable exercise of its business judgment,

8   determined that the Lease is burdensome and has no residual value for Ridge Hill or the Estate.

9                                              **III.**

10                                        **CONCLUSION**

11    For the reasons set forth above, Ridge Hill respectfully requests entry of an order,

12   substantially in the form of the Proposed Order, and such further relief as the Court finds

13   appropriate.

14   Dated:  August 13, 2020                    Respectfully submitted,

15                                              **Sulmeyer**Kupetz
                                               A Professional Corporation
16

17

18                                      By:        */s/David S. Kupetz*
                                               _____
19                                             David S. Kupetz
                                               Steven F. Werth
20                                             Attorneys for Sandbox VR Ridge Hill, LLC and
                                               related debtors

21

22

23

24

25

26

27

28

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

## DECLARATION OF STEVEN ZHAO

1. I am over the age of 18 years.

2. I have personal knowledge of the facts stated herein. I can testify that these facts are true and correct.

3. I make this declaration in support of the attached "Emergency Motion For Order Rejecting Lease With Yonkers Associates, LLC" (the "Motion"). Capitalized terms have the meaning given them in the Motion.

4. I am the manager of the Ridge Hill. I have been the manager of Ridge Hill since its formation.

5. Ridge Hill is part of a single business enterprise, along with its parent, Glostation Core USA, Inc., a Delaware corporation, Core's parent Glostation USA, Inc., a Delaware corporation, and eight other wholly-owned subsidiaries of Core.

6. On the Petition Date, the Debtors commenced Chapter 11 bankruptcy cases.

7. The Debtors are part of a business enterprise established to develop, operate, and franchise facilities offering full-body tracking, free roaming, virtual reality experiences for private groups (meaning no strangers can play together), operating under the name "Sandbox VR ™" (the "Business"). The website for the Business is www.sandboxvr.com.

8. Ridge Hill entered into the Lease for the purpose of opening a store so that the Debtors could offer this type of VR experience at the Premises. However, the Coronavirus struck before Ridge Hill moved in to the Premises. As a result, Ridge Hill did not move in to the Premises, was not able to open the store at the Premises, has never conducted business at the Premises, and has no personal property at the Premises. Additionally, the Landlord never delivered the Premises to Ridge Hill. Now that the Coronavirus has made operation of all stores more difficult, continued use of the Lease is no longer a benefit to the Estate or its creditors.

9. Because Ridge Hill has never operated a store at the Premises, and the cost associated with doing so would be substantial (including installation of improvements, the purchase of equipment, the hiring of staff to operate the store, and the continued payment of rent which is $15,000 per month under the Lease), Ridge Hill determined that there is no benefit to

1 | continuing to make Lease payments. The administrative burden of these payments will far exceed

2 | any benefit the Estate may otherwise receive from the store opening in the future.

3 |         10.     The Landlord is currently holding a deposit of Ridge Hill's in the amount of

4 | $45,012.50.

5 |     I declare under penalty of perjury under the laws of the United States of America that the

6 | foregoing is true and correct and that this declaration was executed July 31, 2020, at Hong Kong.

7

8 | Steven Zhao

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

SFW 2703103v1

008

**EXHIBIT 1**

David S. Kupetz (CA Bar No. 125062)
  *dkupetz@sulmeyerlaw.com*
Steven F. Werth (CA Bar No. 205434)
  *swerth@sulmeyerlaw.com*
Claire K. Wu (CA Bar No. 295966)
  *ckwu@sulmeyerlaw.com*
**Sulmeyer**Kupetz
A Professional Corporation
333 South Grand Ave, Suite 3400
Los Angeles, California 90071
Telephone: 213.626.2311
Facsimile: 213.629.4520

Attorneys for Sandbox VR Ridge Hill, LLC
and related debtors

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re | Case No.  1:20-bk-11440-MB |
| SANDBOX VR RIDGE HILL, LLC, a Delaware limited liability company, | Chapter 11 |
| Debtor. | **ORDER GRANTING EMERGENCY MOTION FOR ORDER REJECTING LEASE WITH YONKERS ASSOCIATES, LLC** |
| Federal EIN:  83-2686743 | Hearing: |
| | Date:<br>Time:<br>Place:    U.S. Bankruptcy Court<br>Courtroom 303<br>21041 Burbank Blvd.<br>Woodland Hills, CA 90012 |

**Sulmeyer**Kupetz, A Professional Corporation
333 South Grand Avenue, Suite 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1       On August ___, 2020 at _____, the Court conducted an emergency hearing on the

2   "Emergency Motion For Order Rejecting Lease With Yonkers Associates, LLC" (the "Motion")

3   filed by Sandbox VR Ridge Hill, LLC, debtor and debtor in possession in the above-captioned

4   case (the "Debtor").  Appearances were made as noted on the record.  For the reasons stated on the

5   record, and for good cause appearing, the Court hereby **ORDERS** as follows:

6       1.    The Motion is granted.

7       2.    The Debtor's rejection of the Lease (as that term is defined in the Motion) is

8             approved, with such rejection effective as of the Petition Date (as defined in the

9             Motion).

10                                   ###

**Sulmeyer**Kupetz, A Professional Corporation
333 South Grand Avenue, Suite 3400
LOS ANGELES, CALIFORNIA  90071-1406
TEL. 213.626.2311  •  FAX 213.629.4520

**EXHIBIT 2**

RIDGE HILL
YONKERS, NEW YORK


**LANDLORD**

======================================================================
**YONKERS ASSOCIATES, LLC,**
a New York limited liability company


**TENANT**

======================================================================
**SANDBOX VR RIDGE HILL, LLC,**
a Delaware limited liability company
dba
Sandbox VR


Unit No.  1030

## TABLE OF CONTENTS

Section 1.0 - Basic Lease Provisions. ........................................................................................... 1
Section 1.1 - Defined Terms.......................................................................................................... 4
Section 2.1 - Exhibits. .................................................................................................................. 5
Section 3.1 - Premises ................................................................................................................. 6
Section 3.2 - Gross Leasable Area of the Premises ...................................................................... 6
Section 3.3 - Revisions to Premises GLA. .................................................................................... 6
Section 3.4 - Landlord's Reservation. ........................................................................................... 6
Section 3.5 - Landlord's Relocation Right....................................................................................... 7
Section 4.1 - Tenant's Use of Common Areas................................................................................. 8
Section 4.2 - Management and Operation of Common Areas. ....................................................... 9
Section 5.1 - Site Plan and Leasing Plan. ..................................................................................... 9
Section 5.2 - Changes to Shopping Center Site Plan and Leasing Plan.......................................10
Section 6.0 – Construction Allowance. .........................................................................................10
Section 6.1 - Landlord's Responsibilities. .....................................................................................11
Section 6.2 - Tenant's Responsibilities.........................................................................................11
Section 6.3 - Tenant's Trade Fixtures ...........................................................................................13
Section 6.4 - Labor Cooperation. .................................................................................................13
Section 7.1 - Submission of Plans and Specifications. .................................................................13
Section 8.1 - Operation and Use of Premises. ..............................................................................14
Section 8.2 - Tenant's Covenant to Operate. ................................................................................14
Section 8.3 - Prohibitions on Use. ................................................................................................15
Section 8.4 - Manner of Operation of Business. ...........................................................................15
Section 8.5 - Hazardous Materials. ..............................................................................................16
Section 8.6 - Conditions for the Sale of Alcoholic Beverages. .....................................................17
Section 9.1 - Commencement Date Agreement. ...........................................................................17
Section 9.2 - Holding Over ...........................................................................................................17
Section 9.3 - Expiration of the Term of Lease................................................................................18
Section 9.4 – Gross Revenue Termination Right............................................................................18
Section 10.1 - Rent Commencement Date.....................................................................................19
Section 10.2 - Delay or Failure to Deliver Premises to Tenant. .....................................................19
Section 11.1 - Fixed Minimum Rent. .............................................................................................20
Section 11.2 - Percentage Rent. ...................................................................................................20
Section 11.3 - Additional Rent.......................................................................................................23
Section 11.4 - Real Estate Taxes. .................................................................................................24
Section 11.5 - Utility and Insurance Costs.....................................................................................24
Section 11.6 - Security Deposit. ....................................................................................................24
Section 12.1 - Utility Service Charges. ..........................................................................................25
Section 12.2- Discontinuance of Service. ......................................................................................26
Section 12.3- Interruption of Service. ............................................................................................27
Section 12.4- Premises Sprinkler System. ....................................................................................27
Section 13.1 – Storefront Sign. .....................................................................................................28
Section 13.2 - Interior Signs and Advertising.................................................................................28
Section 14.1 - Repairs by Landlord. ..............................................................................................28
Section 14.2 - Repairs by Tenant. .................................................................................................29
Section 14.3 - Alterations and Remodeling. ..................................................................................29
Section 15.1 - Lien Indemnification by Tenant...............................................................................30
Section 16.1 - Indemnification. ......................................................................................................30
Section 16.2 - Tenant's Insurance Requirements...........................................................................31
Section 16.3 - Waiver of Subrogation. ...........................................................................................32

Section 16.4 - Landlord Not Responsible for Acts of Others....................................................33
Section 16.5 - Landlord's Insurance. ...........................................................................................33
Section 17.1 - Rules and Regulations. .........................................................................................34
Section 17.2 - Rubbish.................................................................................................................34
Section 17.3 - Lighting. ................................................................................................................34
Section 17.4 - Merchandise Display, Loading and Unloading....................................................34
Section 17.5 - Obstruction of Passageways. ...............................................................................34
Section 18.1 - Subordination of Lease. .......................................................................................34
Section 18.2 - Attornment by Tenant...........................................................................................35
Section 18.3 - Landlord as Attorney-in-Fact for Tenant. ............................................................35
Section 19.1 - Landlord's Right to Repair....................................................................................35
Section 19.2 - Landlord's Right to Affix to Exterior .....................................................................36
Section 19.3 - Landlord's Right to Make Payments on Behalf of Tenant. ..................................36
Section 20.1 - Landlord's Consent Required. ..............................................................................36
Section 20.2 - Insolvency Proceedings........................................................................................36
Section 20.3 - Transfer of Corporate Shares...............................................................................37
Section 20.4 - Assignment to Related Entity. ..............................................................................37
Section 20.5 - Transfer of Other Business Interests. ..................................................................37
Section 20.6 - Acceptance of Rents by Landlord.........................................................................37
Section 20.7 - No Release of Liability..........................................................................................38
Section 20.8 - Administrative Fee.................................................................................................38
Section 21.1 - Landlord's Obligation to Repair and Reconstruct.................................................38
Section 21.2 - Option to Terminate..............................................................................................39
Section 21.3 - Demolition of Landlord's Building. ........................................................................39
Section 22.1 - Effect of Taking. ...................................................................................................39
Section 22.2 - Compensation and Awards. .................................................................................40
Section 22.3 - Condemnation or Breach of Lease. .....................................................................40
Section 23.1 - Default...................................................................................................................40
Section 23.2 - Remedies and Damages.......................................................................................42
Section 23.3 - Remedy for Failure to Open or Operate. .............................................................43
Section 23.4 - Repeated Default. .................................................................................................43
Section 23.5 - Waiver of Rights of Redemption...........................................................................44
Section 24.1 - Restriction on Tenant............................................................................................44
Section 24.2 - Imposition of Damages.........................................................................................44
Section 24.3 – Exclusive Use.......................................................................................................44
Section 25.1 - Notices to Tenant and Landlord............................................................................45
Section 25.2 - Notices to Mortgagee............................................................................................45
Section 26.1 - Accord and Satisfaction.........................................................................................46
Section 26.2 - Complete Agreement. ...........................................................................................46
Section 26.3 - Consents................................................................................................................46
Section 26.4 - Brokerage. .............................................................................................................47
Section 26.5 - Effective Date of Lease. ........................................................................................47
Section 26.6 - Estoppel Certificates. ...........................................................................................47
Section 26.7 - Force Majeure. ......................................................................................................47
Section 26.8 - Interpretation. ........................................................................................................47
Section 26.9 - Memorandum of Lease. .........................................................................................48
Section 26.10 - Quiet Enjoyment..................................................................................................48
Section 26.11 - Rent Demand. ......................................................................................................48
Section 26.12 - Section and Title Headings..................................................................................48
Section 26.13 - Successors and Assigns. ....................................................................................48
Section 26.14 - Waiver..................................................................................................................48

Section 26.15 - Exculpation...................................................................................................49
Section 26.16 - Transfer of Landlord's Interest.....................................................................49
Section 26.17 - Litigation; Attorneys' Fees. ..........................................................................49
Section 26.18 – Protection of REIT Status. ...........................................................................50
Section 26.19 – Patriot Act....................................................................................................50
Section 26.20 – Counterparts................................................................................................50
Section 26.21 – Perpetuities Protection................................................................................51
Section 26.22 – YIDA Reporting Requirements.....................................................................51
Section 26.23 – Covenant Not to Oppose Whole Foods Wine License Application. .................51

# L E A S E

THIS LEASE (this "Lease") IS MADE AND ENTERED INTO AT Cleveland, Ohio, this

_15th_ day of March, 2019 (the "Effective Date"), by and between **YONKERS ASSOCIATES,**

**LLC**, a New York limited liability company, having an address for purposes hereof at 600 Superior

Avenue East, Suite 1500, Cleveland, Ohio 44114 ("Landlord"), and **SANDBOX VR RIDGE HILL,**

**LLC**, a Delaware limited liability company, having an address for purposes hereof at 4695 Chabot

Drive, Suite 200, Pleasanton, California 94588, d/b/a Sandbox VR ("Tenant").

## WITNESSETH

### ARTICLE I
### INTRODUCTORY PROVISIONS

Section 1.0 - Basic Lease Provisions.

The following Basic Lease Provisions are an integral part of this Lease, and are referred to in other sections hereof, including, without limitation, the sections identified below which are presented in this Section 1.0 for the convenience of the parties. They are not intended to constitute an exhaustive list of all terms contained in this Lease or of all charges that may become due and payable under this Lease. In addition to the other provisions that are elsewhere defined in this Lease, the following, whenever used in this Lease shall have the meanings set forth in this Section 1.0.

(a)   Shopping Center:   Ridge Hill                          (Section 1.1(g))

(aa)   Address of Shopping Center: As of the Effective Date, the address of the Shopping Center is 247 Market Street, Yonkers, New York 10710

(b)   Unit No.:   1030

(c)   Premises GLA:   Approximately 7,202 square feet

(d)   Term of Lease:   Ten (10) Lease Years (as hereinafter defined) commencing on the Rent Commencement Date (as hereinafter defined) and expiring on the Term Expiration Date (as hereinafter defined).

(dd)   Renewal Option(s):   None.

(e)   Rent Commencement                          (Section 10.1)
Date:   The earlier of (i) the Outside Opening Date (as hereinafter defined), or (ii) the date Tenant opens for business. The "Outside Opening Date" shall be one hundred eighty (180) days after later of (y) the date Landlord has delivered possession of the Premises to Tenant, and (z) Tenant's receipt of Tenant's Permits (as hereinafter

defined), provided that Tenant satisfies the Permit Conditions (as hereinafter defined). In the event of a failure of any of the foregoing conditions, then the Outside Opening Date shall be one hundred eighty (180) days from Landlord's delivery of the Premises to Tenant.

(f)   <u>Term Expiration Date</u>:

The day prior to the tenth (10th) anniversary of the Rent Commencement Date. In the event that the Rent Commencement Date should occur on a day other than the first day of a calendar month, the Term Expiration Date shall be deemed to be midnight on the last day of the calendar month in which the Term Expiration Date occurs.

(g)   <u>Fixed Minimum Rent</u>:                                   (Section 11.1)

| Lease Year | Rate Per Square Foot | Monthly | Annual |
| --- | --- | --- | --- |
| 1 | $25.00 | $15,004.17 | $180,050.00 |
| 2 | $25.75 | $15,454.29 | $185,451 50 |
| 3 | $26.52 | $15,917.92 | $191,015.05 |
| 4 | $27.32 | $16,395.46 | $196,745.53 |
| 5 | $28.14 | $16,887.33 | $202,647.93 |
| 6 | $28.98 | $17,393.95 | $208,727.36 |
| 7 | $29.85 | $17,915.77 | $214,989.21 |
| 8 | $30.75 | $18,453.24 | $221,438.89 |
| 9 | $31.67 | $19,006.84 | $228,082.08 |
| 10 | $32.62 | $19,577.05 | $234,924.56 |

Subject to adjustment if Premises GLA is revised:   (Section 3.3)
___X___ yes       _____ no.

(h)   <u>Percentage Rent</u>:                                   (Section 11.2)

Five percent (5%) of annual Gross Revenue (as hereinafter defined) in excess of the following Annual Breakpoints:

| Lease Year | Annual Breakpoint |
| --- | --- |
| 1 | $3,601,000.00 |
| 2 | $3,709,030.00 |
| 3 | $3,820,300.90 |
| 4 | $3,934,910.65 |
| 5 | $4,052,958.63 |
| 6 | $4,174,547.11 |
| 7 | $4,299,784.13 |
| 8 | $4,428,777.71 |
| 9 | $4,561,641.65 |
| 10 | $4,698,491.17 |

(i)   <u>Additional Rent</u>:                                   (Section 11.3)

Additional Rent shall be charged in the initial amount of Five and 00/100 Dollars ($5.00) per square foot of Premises GLA which shall

2

be subject to annual compounded increases equal to four percent (4%) of the immediately preceding Lease Year's Additional Rent.

(j)  Tenant's Fixed Share of Taxes:                                    (Section 11.4)
Tenant's Fixed Share of Taxes shall mean the dollar amounts calculated as set forth on **Exhibit E** hereto (regardless of the actual amount of real estate taxes or payments made in lieu thereof by Landlord, and regardless of any reimbursements received by Landlord of any portions thereof).

(k)  Common Area Utility
and Insurance Costs: Included in Fixed Minimum Rent.

(l)  Premises Utilities:                                                        (Section 12.1)
Payable by Tenant as billed per metered, sub-metered or estimated and adjusted billing.

(m)  Trade Name:               Sandbox VR                         (Section 8.1)

(n)  Permitted Use:                                                            (Section 8.1)
Subject to the existing use restrictions as of the Effective Date, Tenant shall use and occupy the Premises solely for the operation of a typical Sandbox VR, which (i) operates a first-class virtual reality experience center, utilizing virtual reality equipment to allow customers to engage in virtual reality games at the Premises, and (ii) sells, on an incidental basis, concessions, snacks, and non-alcoholic beverages.

In no event shall the Permitted Use include any operation which could be construed as sexually-oriented in nature or which could result in the Premises being perceived as offering sexually-oriented services (including, without limitation, any nudity). In furtherance thereof, the foregoing virtual reality experience center shall be consistent with the family-oriented nature of the Shopping Center.

Subject to the existing use restrictions as of the Effective Date, Tenant shall be permitted to sell, on an incidental basis, alcoholic beverages in, to or from the Premises for on-Premises consumption, so long as (1) such sale of alcoholic beverages shall be in compliance with Applicable Laws (as hereinafter defined) and Section 8.6, and (2) Tenant shall obtain and carry Liquor Liability Insurance (as hereinafter defined) in compliance with Section 16.2(a)(v).

The Premises shall be used for no other purpose whatsoever.

(o)  Tenant's Billing Address:     4695 Chabot Drive, Suite 200
Pleasanton, California 94588
Attn: Legal Department
Contact Phone No.: 925-558-2768
Contact E-Mail: corp-us@sandboxvr.com

3

019

(p)    Tenant's Notice Address:        Same as Section 1.0(o)        (Section 25.1)

(q)    Landlord's Notice Address:                                    (Section 25.1)
                                  600 Superior Avenue East, Suite 1500
                                  Cleveland, Ohio 44114
                                  Attn: Associate General Counsel, Leasing

(r)    Landlord's Mortgagee's
       Notice Address:        N/A

(s)    Address for
       Payment of Rents:    Yonkers Associates LLC
                            P.O. Box 826532
                            Philadelphia, Pennsylvania 19182-6532

(t)    Address for Percentage Rent
       Reports:              email to: TenantSalesQIC@realfoundations.net

(u)    Guarantor:          GloStation USA, Inc.               (Guaranty)
                           4695 Chabot Drive, Suite 200,
                           Pleasanton, California 94588
                           Attn: Legal Department
                           Contact Phone No.: 925-558-2768
                           Contact E-Mail: corp-us@sandboxvr.com

(v)    Security Deposit:    $45,012.50                        (Section 11.6)

(w)    Initial Construction Allowance: $65.00 per square foot of Premises GLA    (Section 6.0)

Section 1.1 – Defined Terms.

        Wherever used in this Lease, the following terms shall be construed to mean as follows:

        (a)    "Applicable Laws" shall mean collectively all laws, rules, orders, ordinances, directions, regulations and requirements of governmental authorities having jurisdiction affecting or applicable to the Premises (including, without limitation, federal, state/commonwealth, county, municipal authorities) now in force or which hereafter may be in force which shall impose any duty upon Landlord or Tenant with respect to the initial improvement, use, occupation or alteration of the Premises by Tenant, including, but not limited to, (i) requirements of the Americans with Disabilities Act ("ADA") which may be applicable thereto, and (ii) the cleanliness, safety, occupancy and use of the Premises.

        (b)    "Common Areas" shall mean the Shopping Center amenities, plaza areas, parking areas, driveways, aisles, sidewalks, loading docks, passageways, landscaping, courts, stairs, ramps, elevators, escalators, meeting rooms, public restrooms and other common service areas provided for by Landlord for the common or joint use and benefit of the tenants and occupants of the Shopping Center, their employees, agents, customers and invitees.

        (c)    "Lease Year" shall mean each consecutive twelve (12) month period beginning with the Rent Commencement Date, provided it has occurred on the first day of a calendar month.

4

In the event that the Rent Commencement Date should occur on a day other than the first day of a calendar month, a Lease Year shall be each consecutive twelve (12) month period commencing on the first day of the calendar month next following the Rent Commencement Date.

(d)     "Majors" shall mean those separately demised spaces located in the Shopping Center whose contiguous floor area exceeds thirty thousand (30,000) square feet ("Majors Threshold").

(e)     "Premises" shall mean the specific demised space leased to Tenant by Landlord now existing or to be constructed in the Shopping Center, known as Unit No. 1030, and further being a space containing approximately 7,202 square feet of floor space.  The Premises are set forth on **Exhibit B** attached hereto and made a part hereof for the sole purpose of more specifically locating said area.

(f)     "Rents" or "Rent" shall mean Fixed Minimum Rent, Percentage Rent, and any and all other sums of money required to be paid by Tenant to Landlord pursuant to this Lease whether or not any of such sums are specifically designated herein as Rents.

(g)     "Shopping Center" shall mean those buildings, land (excluding outparcels along the perimeter of the Shopping Center, if any) and Common Areas comprising the shopping center development owned by and/or ground leased to Landlord and/or the Majors and known as "Ridge Hill" located in Yonkers, Westchester County, New York, as shown on **Exhibit A** attached hereto and made a part hereof, as the same may be changed from time to time by addition thereto or subtraction therefrom, together with the improvements constructed thereon from time to time. Notwithstanding the foregoing, Landlord expressly reserves the right, in the exercise of its sole discretion, to change the name of the Shopping Center at any time during the Term of Lease.

(h)     "Tenant's Proportionate Share" shall mean a fraction, the numerator of which is the Premises GLA, and the denominator of which is, with respect to all prorated charges (as defined in Article XI), the total number of square feet of actually occupied area in the Shopping Center, excluding the number of square feet of all spaces exceeding the Majors Threshold, whether or not occupied.

## ARTICLE II
## EXHIBITS

Section 2.1 - Exhibits.

The following exhibits are attached hereto or otherwise incorporated herein by reference and made a part of this Lease:

EXHIBIT A     -     Site Plan of the Shopping Center

EXHIBIT B     -     Leasing Plan of the Shopping Center

EXHIBIT B-1  -     Exclusive Area

EXHIBIT B-2  -     Relocation Area

EXHIBIT C     -     Tenant Handbook for Shopping Center - containing sign and design criteria - not attached but incorporated herein by reference.

EXHIBIT C-1  -     Tenant's Work

5

021

EXHIBIT C-2   -      Required Tenant Contractor's Deposit and Fees

EXHIBIT D     -      Rules and Regulations

EXHIBIT E     -      Tenant's Fixed Share of Taxes

ARTICLE III
PREMISES

Section 3.1 - <u>Premises</u>.

In consideration of the payment of all Rents and the performance of all covenants as hereinafter set forth, Landlord demises unto Tenant and Tenant leases from Landlord the Premises, subject to all conditions and easements of record for the Term of Lease and upon the terms and conditions set forth in this Lease.

Section 3.2 - <u>Gross Leasable Area of the Premises</u>.

The gross leasable area of the Premises ("<u>Premises GLA</u>") shall be computed based on the lease lines of the Premises defined as follows:  The lease line for common demising walls between adjoining tenants shall be the center line of the common demising wall, and on non-common demising walls such as between the Premises and service corridors, mechanical rooms, or the building exterior, the lease line shall be the outside face of the demising wall.  Any recesses required to accommodate the door swing of the exit door for the Premises shall be considered part of the Premises.  No deductions shall be made for existing columns or bracing within the Premises or along the demising walls, but deductions shall be made for the areas occupied by major vertical duct shafts.

Section 3.3 - <u>Revisions to Premises GLA</u>.

The Premises GLA has been determined pursuant to the provisions of <u>Section 3.2</u> by reference to either "CAD" or scaled architectural drawings of the Premises.  Landlord and Tenant acknowledge that, irrespective of whether or not the Premises shall have been constructed as of the Effective Date, in the event that Landlord's final as-built field or CAD measurements of the Premises after all leasehold improvements have been constructed therein should disclose a different square footage than the Premises GLA ("<u>Final Revised Premises GLA</u>"), then Landlord agrees to notify Tenant in writing of the Final Revised Premises GLA.  Tenant further acknowledges and agrees that such notice by Landlord shall be deemed sufficient to amend the Premises GLA, such amendment being deemed self-operative without the necessity of further formal mutual acknowledgment or documentation between Landlord and Tenant.  When so finally determined, the Final Revised Premises GLA shall be used as the numerator in computing Tenant's Proportionate Share of all prorated charges and in all computations of Fixed Minimum Rent and the Initial Construction Allowance, if such amounts have been determined on a square foot (as opposed to a fixed rate) basis.  If the Fixed Minimum Rent should be revised, Landlord's revised billing to Tenant shall be deemed sufficient notice of such Rent revisions and the Annual Breakpoints shall be correspondingly adjusted.

Section 3.4 - <u>Landlord's Reservation</u>.

Landlord reserves to itself the roof and exterior walls of the building containing the Premises and all space above the ceiling within the Premises to accommodate the Shopping Center's structural, mechanical and electrical conduit, piping, ducting or venting requirements.

6

Landlord and its agents further reserve the right on behalf of themselves or an authorized utility company to run utility lines, pipes, conduit or ductwork when necessary or desirable through the air space above Tenant's ceiling, columns or within the walls of the Premises, and to maintain, repair, alter, replace or remove same in locations which will not materially interfere with Tenant's use of the Premises.

Section 3.5 – Landlord's Relocation Right.

(a)      Subject to the terms and conditions of this Section 3.5, Landlord hereby reserves the right at any time following the Rent Commencement Date to change the location of the Premises to a new location (the "New Premises") within the area of the Shopping Center identified on **Exhibit B-2** (the "Relocation Area"). Landlord will use reasonable efforts to cooperate with Tenant to identify a New Premises within the Relocation Area that is reasonably acceptable to Landlord and Tenant, such period of determination not to exceed thirty (30) days. Following such determination of a mutually acceptable New Premises, Landlord shall notify Tenant at least sixty (60) days' prior to the proposed relocation date (the "Relocation Date") of Landlord's intention to relocate Tenant (the "Relocation Notice") to the mutually-agreeable New Premises.

(b)      If Landlord and Tenant are not able to agree to a New Premises that is mutually acceptable, then Landlord shall notify Tenant at least sixty (60) days' prior to the Relocation Date of Landlord's intention to relocate Tenant to a New Premises of Landlord's choosing, in Landlord's reasonable discretion, provided such New Premises contains approximately the same number of square feet as the original Premises. In the event the New Premises described in the Relocation Notice is unacceptable to Tenant, in Tenant's reasonable discretion, then Tenant shall have the right to terminate this Lease within thirty (30) days after Tenant's receipt of the Relocation Notice by delivering written notice to Landlord (the "Relocation Termination Notice"). If Tenant elects to terminate this Lease, then Landlord shall have the option to rescind the Relocation Termination Notice by delivering notice to Tenant ("Landlord's Rescission Notice") within thirty (30) days after the date Landlord receives the Relocation Termination Notice, in which event, the Relocation Termination Notice shall be null and void and this Lease shall continue full force and effect without relocation of Tenant. If Landlord does not provide Landlord's Rescission Notice to Tenant, this Lease and the obligations of the parties, excluding any obligations of the parties that expressly survive the termination or expiration of this Lease, or have otherwise accrued as of the Relocation Termination Date (hereinafter defined), shall terminate as of the date which is thirty (30) days after the date of the Relocation Notice (the "Relocation Termination Date"), provided Tenant pays to Landlord all sums and charges due and owing by Tenant to Landlord through and including the Relocation Termination Date. Any sum which cannot be exactly determined by Landlord as of the Relocation Termination Date shall be paid by Tenant to Landlord within thirty (30) days after Tenant's receipt of a statement therefor. The foregoing obligation shall survive termination of this Lease. If Tenant shall not terminate this Lease within the thirty (30)-day period set forth above, Tenant shall be deemed to have waived its right to terminate this Lease, and shall relocate to the New Premises as set forth in this Section 3.5. Landlord's rescission of the Relocation Notice shall not be deemed a waiver of Landlord's right to relocate Tenant to New Premises in the future.

(c)      If Tenant shall not terminate this Lease within the thirty (30)-day period set forth in Section 3.5(b), or if Tenant accepts the New Premises pursuant to Sections 3.5(a) or (b), then Tenant hereby agrees to be bound by such election and to execute, upon receipt from Landlord, whatever amendments or other instruments as may be required to correctly reflect the foregoing. Landlord shall, at Landlord's sole cost and expense, (i) renovate the New Premises so that the same are substantially comparable to the original Premises as of the date of the Relocation Notice (including leasehold improvements; provided, however, Landlord and Tenant acknowledge and

7

agree that Landlord may relocate Tenant's existing fixtures and/or trade fixtures from the Premises or purchase fixtures and/or trade fixtures comparable to the existing same, such election in Landlord's sole discretion, and Tenant may request that the New Premises be constructed based upon an updated prototype, so long as Tenant pays any and all increased costs for such updated prototype as compared to the original Premises) and (ii) move and re-install Tenant's existing fixtures and trade fixtures (if Landlord does not elect to purchase new fixtures and/or trade fixtures) and storefront sign.   Tenant shall not be required to close the Premises and relocate Tenant's personal property, furniture, inventory and supplies from the original Premises to the New Premises prior to the date that Landlord is ready to relocate Tenant's existing fixtures and/or trade fixtures to the New Premises, and the renovation of the New Premises is substantially complete.   As used herein, "substantially complete" shall mean completion of the renovation of the New Premises to such an extent that, upon the relocation of the aforementioned items, Tenant can open for business in the New Premises without material interference by Landlord while Landlord is completing such remodel.   Tenant's acceptance of possession of the New Premises as substantially complete shall not relieve Landlord of its obligation to diligently carry forward its remodel of the Premises as required by this Section 3.5.

(d)      Landlord agrees to use reasonable efforts to perform such relocation in a manner that will minimize material interruption to Tenant's business.

(e)      Upon substantial completion of the New Premises, Tenant shall diligently relocate Tenant's personal property, furniture, inventory and supplies from the original Premises to the New Premises, and promptly re-open for business in the New Premises.   Landlord shall pay Tenant's actual, reasonable out-of-pocket costs to relocate Tenant's personal property, furniture, inventory and supplies from the original Premises to the New Premises (the "Relocation Costs"), which Relocation Costs shall be paid within thirty (30) days following Landlord's receipt of canceled checks and invoices evidencing the actual cost of such items.

(f)      If during such relocation Tenant is required to cease operating in the Premises due to: (i) delays caused by Landlord and Landlord's employees, agents or contractors, then as Tenant's sole and exclusive remedy, and/or (ii) Tenant's relocation of its personal property, furniture, inventory and supplies from the original Premises to the New Premises (not to exceed two (2) weeks), then Rent shall be abated for the period of time that Tenant is required to cease operating in the Premises (the "Relocation Damages"), which Relocation Damages shall immediately cease upon the date Tenant is able to conduct its business in the New Premises. Tenant acknowledges and agrees that Tenant shall not be entitled to Relocation Damages for the relocation of its personal property, furniture, inventory and supplies from the original Premises to the New Premises (1) for periods of closure in excess of two (2) weeks, and/or (2) if Tenant fails to diligently complete such relocation and promptly re-open for business in the New Premises.

(g)      Landlord shall have no liability for such relocation or the closing of the Premises other than as specifically set forth in this Section 3.5 and Tenant waives any such claims including, without limitation, claims for lost profits.

ARTICLE IV
COMMON AREAS

Section 4.1 - Tenant's Use of Common Areas.

(a)      Landlord grants to Tenant and its agents, employees and customers, a non-exclusive license, subject to the reasonable rules and regulations promulgated by Landlord, to

8

use the Common Areas in common with other tenants and occupants of the Shopping Center, their agents, employees and customers during the Term of Lease, subject to the exclusive control and management thereof at all times by Landlord and subject further to the rights of Landlord as set forth in Section 4.2.

(b)     Landlord reserves the right to construct, lease and/or license kiosks, carts, and other sales areas on any portions of the Common Areas.

(c)     Tenant shall not use the Common Areas for any other purpose than designated by Landlord.

Section 4.2 - Management and Operation of Common Areas.

(a)     Landlord will use commercially reasonable efforts to operate and maintain, or will cause to be operated and maintained, the Common Areas in the best interest of the Shopping Center and in a manner consistent with the operation of similar shopping centers located in the Yonkers, New York area.  Subject to Section 4.2(b), Landlord will have the right (i) to establish, modify and enforce reasonable rules and regulations with respect to the Common Areas for the general benefit of Landlord and all tenants of the Shopping Center; (ii) to enter into, modify and terminate easements and other agreements pertaining to the use and maintenance of the parking areas and fees (if any) for use of such parking areas and other Common Areas; (iii) to provide for employee parking and formulate reasonable rules and regulations for same; (iv) to close such portions of said parking areas or other Common Areas to such extent as may, in the reasonable opinion of Landlord, be necessary to prevent a dedication thereof or the accrual of any right to any person or to the public therein or for any other reason in the best interest of Landlord and all tenants; (iv) to close temporarily any or all portions of the Common Areas for repairs or refurbishing; (v) to discourage non-customer parking; (vi) to move, remove, relocate and/or replace seats, trees, planters and other amenities; and (vii) to do such other acts in and to said Common Areas and improvements in the exercise of good business management, as Landlord, in the exercise of its reasonable business judgment, shall deem advisable.

(b)     Notwithstanding the foregoing, subject to Landlord's compliance with Applicable Laws, casualty, condemnation, or on a temporary basis in connection with emergencies, maintenance, repair, or construction, Landlord agrees to exercise Landlord's control of the Common Areas so as to not materially and adversely (i) restrict access, ingress and egress to and from the Premises, (ii) obstruct visibility of Tenant's storefront signage and storefront, or (iii) interfere with the operation of Tenant's business in the Premises.

ARTICLE V
CHANGES AND ADDITIONS TO
SHOPPING CENTER SITE PLAN AND LEASING PLAN

Section 5.1 - Site Plan and Leasing Plan.

The Site Plan and Leasing Plan attached hereto as **Exhibits A** and **B**, respectively, are for the sole purpose of showing the approximate shape, design, proposed land areas and location of the buildings in the Shopping Center.  The Site Plan is provided for informational purposes only, and shall not be deemed to be a warranty, representation or agreement by Landlord that the Shopping Center or buildings and/or any stores will be exactly as indicated on the Site Plan, or that the other tenants which may be drawn on said Site Plan will be occupants in the Shopping Center.

9

Section 5.2 - <u>Changes to Shopping Center Site Plan and Leasing Plan</u>.

Subject to <u>Section 4.2(b)</u>, Landlord reserves the right at any time and from time to time to (a) make or permit changes or revisions in the Site Plan and/or Leasing Plan for the Shopping Center, including additions thereto, subtractions therefrom, rearrangements, alterations, or modifications or supplements to, the building areas, walkways, parking areas, driveways or other Common Areas; (b) construct other buildings or improvements in the Shopping Center and/or to make alterations thereof or additions thereto, to build additional stories on any such building or buildings, or to build adjoining same; (c) make or permit changes or revisions to the Shopping Center, including additions thereto; and (d) convey portions of the Shopping Center to others for the purpose of constructing thereon other buildings or improvements, including additions thereto and alterations thereof.  There has been no representation or warranty by Landlord, and Tenant acknowledges that there is no inducement or reliance to lease the Premises, on the basis that the existing access to light, air and views from the Premises would continue unabated. Tenant acknowledges and understands that it shall have no rights to the airspace above the Premises and the Shopping Center and those rights shall be the sole property of Landlord.

### ARTICLE VI
### IMPROVEMENTS

Section 6.0 – <u>Construction Allowance</u>.

(a)(i)    Landlord shall pay to Tenant, as its total obligation hereunder, (1) the Initial Construction Allowance and (2) the Additional Construction Allowance (as hereinafter defined) which sums represent Landlord's contribution to Tenant's Work (as hereinafter defined) (the Initial Construction Allowance, together with the Additional Construction Allowance, the "<u>Construction Allowance</u>").

(ii)    Within thirty (30) days after the Effective Date, Tenant shall provide to Landlord bids from at least three (3) contractors to complete the portion of Tenant's Work set forth in Section 3 of **Exhibit C-1** (the "<u>Additional Tenant Work</u>"). Within five (5) business days of Landlord's receipt of the bids, Landlord and Tenant shall select the contractor that can cost effectively and timely complete the Additional Tenant Work. The amount of such acceptable bid, together with any additional permit and/or drawing costs that would not have been incurred by Tenant unless Tenant completed the Additional Tenant Work, shall be the "<u>Additional Construction Allowance</u>". In no event shall the Additional Construction Allowance exceed Two Hundred Nine Thousand Two Hundred Seventy-One and 00/100 Dollars ($209,271.00) without Landlord's prior written consent, which consent shall be in Landlord's sole discretion.

(iii)    The Construction Allowance shall be due and payable to Tenant within thirty (30) days following the later to occur of the date Tenant has: (1) opened the Premises for business; (2) furnished Landlord with a copy of its certificate of occupancy and close-out paperwork required under **Exhibit C**; (3) completed construction of the Premises in accordance with Tenant's Approved Plans, including any punchlist items designated by Landlord; and (4) furnished Landlord with an affidavit from Tenant's general contractors listing all subcontractors, materialmen and/or laborers providing services and/or materials in connection with Tenant's Work (collectively "<u>Subcontractors</u>") involved in Tenant's Work, and final, unconditional lien waivers from Tenant's general contractor and all Subcontractors evidencing that the general contractors and all Subcontractors have been paid in full for all work, material and labor furnished in connection with Tenant's Work.

10

(b)     In the event that there are claims or Rents unpaid, work unfinished, or liens filed for such work and labor that have not been bonded or otherwise secured, Landlord may retain from Tenant's Construction Allowance a sum sufficient to pay for said claims, Rents, work or liens and all costs resulting therefrom and to pay for said claims, Rents, work or liens, if necessary. If the amount owed to Tenant by Landlord shall not be sufficient to pay for said claims, Rents, work or liens and the costs resulting therefrom, Tenant shall forthwith pay for said claims, Rents, work or liens and the costs resulting therefrom, or if such be the case, cause such claims or liens to be properly discharged as herein provided.

(c)     Tenant shall have the right at all times, and at its own expense, to contest and defend on behalf of Tenant or Landlord any action involving the collection, validity or removal of such lien(s) upon giving adequate security to Landlord for payment of said lien(s).

(d)     Notwithstanding anything contained herein, the amount of Tenant's Construction Allowance shall not exceed the documented costs of Tenant's Work.

(e)     Tenant shall request payment of the Construction Allowance in writing to Landlord upon satisfaction of the above conditions, and simultaneously therewith, shall provide Landlord with a W-9 form for processing payment of the Construction Allowance.

(f)     In the event this Lease shall be terminated due to a Default by Tenant prior to the Term Expiration Date, Tenant shall pay to Landlord the unamortized portion of the Construction Allowance, said amortization to be computed based upon the Term of Lease, and an annual interest rate of twelve percent (12%).

Section 6.1 - Landlord's Responsibilities.

Tenant acknowledges that it is accepting the Premises in its present **"as-is" "where is"** condition with no expectation that Landlord will or should perform or, except for Landlord's Construction Allowance, contribute towards the cost of any leasehold improvements necessary for Tenant to occupy and conduct its business from the Premises. Tenant hereby acknowledges that: (a) Tenant shall have inspected the Premises and shall be fully aware of the condition of the Premises as of delivery of possession; (b) Landlord shall have no obligation to improve or alter the Premises for the benefit of Tenant; (c) neither Landlord nor any of Landlord's employees, agents, representatives, contractors nor brokers has made any representation or warranty of any kind respecting (w) the condition of the Premises or the Shopping Center, (i) the suitability thereof for Tenant's use or the conduct of Tenant's business, (ii) the working order of any systems or improvements in the Premises or the Shopping Center, or (iii) the occupancy or operation within the Shopping Center by any other person or entity. Tenant irrevocably waives any claim based upon or related to any such claimed representation by Landlord or any claimed representation by Landlord as to traffic to be expected at the Premises or sales to be expected at the Premises. Tenant's taking possession of the Premises shall constitute Tenant's formal acceptance of the same and acknowledgment that the Premises are in the condition called for under this Lease, subject to all field conditions existing at the time of delivery of possession.

Section 6.2 - Tenant's Responsibilities.

(a)     On or before the Rent Commencement Date, Tenant shall at its own expense and in accordance with **Exhibit C**:

(i)     Timely apply for and diligently pursue all permits and licenses necessary for the construction of Tenant's Work ("Tenant's Permits") and Tenant shall comply with

11

all Applicable Laws relating to the conduct of Tenant's Work. Tenant acknowledges that, unless otherwise specifically provided herein, it or its contractor shall be responsible for paying all fees whatsoever which are charged by the applicable governmental authority in connection with, or as a condition of, the issuance of Tenant's Permits.

(ii)    Promptly and diligently construct the leasehold improvements as shown in Tenant's Approved Plans as more fully set forth in Section 7.1, which shall include, but not be limited to, the items specified as Tenant's responsibility on **Exhibit C-1** (together with the Additional Tenant Work, collectively, "Tenant's Work"). Any installation to be made or work to be performed by Tenant on or for the Premises shall be first approved in writing by Landlord prior to commencement of any such work by Tenant. All trade fixtures installed in the Premises shall be new and of first quality.

(b)    Tenant shall at its own expense and in accordance with **Exhibit C**, obtain and maintain on behalf of itself, or any of its contractors or subcontractors, all insurance protection required by Landlord in **Exhibit C**.

(c)    If a construction barricade is necessary during Tenant's Work, then Landlord shall, at its option, either (i) install such barricade on behalf of Tenant and Tenant shall reimburse Landlord within twenty (20) days following receipt of Landlord's billing therefor; or (ii) require Tenant to erect such barricade, at Tenant's expense, in accordance with Landlord's directives. Tenant is responsible for barricade décor/graphics per Landlord's requirements. If Tenant elects not to construct and remove the store barricade and graphics, then Tenant authorizes Landlord to do the construction and removal at Tenant's cost.

(d)    Prior to the commencement of Tenant's Work, Tenant shall pay Landlord the refundable security deposit and other fees set forth on **Exhibit C-2** attached hereto and made a part hereof, as Rent. Tenant shall reimburse Landlord for the cost of any temporary utilities and dumpster usage which shall be due and payable within twenty (20) days following receipt of Landlord's billing therefor.

(e)    In the event Landlord performs any work at the request or on behalf of Tenant which is Tenant's responsibility hereunder, Landlord shall bill Tenant for the reasonable and actual costs thereof and Tenant shall reimburse Landlord for such costs no later than twenty (20) days following receipt of Landlord's billing.

(f)    Provided that Tenant has (i) submitted Tenant's Plans to Landlord in accordance with the terms and conditions of this Lease, (ii) applied for Tenant's Permits within five (5) days after Landlord has approved Tenant's Plans, and (iii) diligently pursued Tenant's Permits, including, without limitation, promptly picking up Tenant's Permits when issued (collectively, the "Permit Conditions"), then if Tenant has not obtained Tenant's Permits within ninety (90) days following Landlord's approval of Tenant's Approved Plans (as hereinafter defined), then Tenant shall promptly notify Landlord, and Landlord shall have the right, at Tenant's sole cost and expense, to pursue and obtain Tenant's Permits on behalf of Tenant. In the event neither Tenant nor Landlord has obtained Tenant's Permits within one hundred twenty (120) days following the Effective Date ("Tenant's Outside Permit Date"), then either Landlord or Tenant may terminate this Lease by delivering written notice to the other party within ten (10) days following Tenant's Outside Permit Date, in which event the parties will have no further rights or liabilities under this Lease, except for any that expressly survive the expiration or earlier termination of this Lease. In the event neither Landlord nor Tenant terminates this Lease upon the expiration of ten (10) days following Tenant's Outside Permit Date, then both parties shall be deemed to have waived its

12

right to terminate this Lease in accordance with this Section 6.2(f) and Tenant shall continue to pursue Tenant's Permits. In the event Tenant fails to comply with the Permit Conditions, then Tenant's termination right set forth in this Section 6.2(f) shall be null and void, as if such termination right were not included in this Lease.

### Section 6.3 - Tenant's Trade Fixtures.

All trade fixtures, signs and apparatus (as distinguished from leasehold improvements) owned by Tenant and installed in the Premises during the Term of Lease shall remain the property of Tenant and shall be removable at any time, including upon the expiration of the Term of Lease, provided Tenant shall not at such time be in Default of any terms or covenants of this Lease, and provided further that Tenant shall promptly repair any damage to the Premises caused by the removal of said fixtures, signs and/or apparatus. If Tenant is in Default under this Lease, Landlord shall have the benefit of any applicable lien on Tenant's property located in or on the Premises as may be permitted under the laws of the state/commonwealth in which the Shopping Center is located, and in the event such lien is asserted by Landlord in any manner or by operation of law, Tenant shall not remove or permit the removal of said property until the lien has been removed and all Defaults have been cured. Any of Tenant's property not removed by Tenant on the Term Expiration Date may be deemed by Landlord as abandoned by Tenant and Landlord may order Tenant to remove said items or have the same removed at Tenant's expense.

### Section 6.4 - Labor Cooperation.

Tenant shall perform or cause Tenant's contractor to perform all of Tenant's Work and any repairs, alterations or improvements to the Premises in a manner so as to avoid any labor dispute which causes or is likely to cause a stoppage or an impairment of work or delivery services or any other services in the Shopping Center. In the event there shall be any such stoppage or impairment as the result of any such labor dispute or potential labor dispute, Tenant shall immediately undertake such action as may be necessary to eliminate such dispute or potential dispute, including, but not limited to (i) removing and/or replacing any or all disputants from the job site until such time as the labor dispute no longer exists; and/or (ii) filing appropriate unfair labor practice charges in the event of a union jurisdictional dispute.

Notwithstanding the foregoing, in the event any work performed by Tenant or Tenant's contractors results in a labor dispute as set forth above, such labor dispute shall not excuse the performance by Tenant as provided for herein.

Landlord represents and warrants to Tenant that Tenant is not required to use union labor to perform the Tenant's Work; however, Landlord recommends the use of union labor, as other projects being completed within the Shopping Center are utilizing union labor.

### ARTICLE VII
### PLANS AND SPECIFICATIONS

### Section 7.1 - Submission of Plans and Specifications.

Tenant shall prepare, at its sole cost and expense, and in full compliance with the provisions of **Exhibit C** including, but not limited to, the sustainability provisions thereof, complete plans and specifications for all of Tenant's Work, including storefront design (collectively, "Tenant's Plans"), and shall submit Tenant's Plans to Landlord or Landlord's designated representative for approval in accordance with the time periods set forth in **Exhibit C**. Tenant shall be required to submit Tenant's Plans to Landlord in a timely manner so that Tenant's Work

13

shall be completed on or before the Rent Commencement Date. No further material changes to Tenant's Plans shall be made after such approval by Landlord without Landlord's prior written consent (such approved Tenant's Plans, "Tenant's Approved Plans"). Landlord's written approval of Tenant's Plans shall, however, create no responsibility or liability on the part of Landlord for their completeness, design sufficiency or compliance with Applicable Laws since it is Tenant's responsibility to have Tenant's Plans prepared in accordance with Applicable Laws.

## ARTICLE VIII
### USE

Section 8.1 - Operation and Use of Premises.

Tenant agrees to operate its business in the Premises under the Trade Name and in accordance with the Permitted Use and for no other business or purpose. Tenant further agrees not to conduct catalog sales or internet sales in or from the Premises, except of merchandise which Tenant is permitted to sell "over-the-counter" consistent with its Permitted Use. Tenant recognizes that the specific limited use prescribed herein is a material consideration to Landlord in entering into this Lease. Notwithstanding the foregoing, except as expressly set forth in Section 24.3, Tenant's specific limited use hereunder shall not be construed to imply that Tenant has an exclusive right to conduct the Permitted Use.

If any governmental license or permit shall be required for the proper and lawful conduct of Tenant's business or other activity conducted in the Premises, or if a failure to procure such a license or permit might or would in any way adversely affect Landlord, the Shopping Center, then Tenant, at Tenant's expense, shall duly procure and thereafter maintain such license or permit and submit the same for inspection by Landlord. Tenant, at Tenant's expense, shall at all times comply with the requirements of each such license or permit.

Section 8.2 - Tenant's Covenant to Operate.

Tenant agrees to complete Tenant's Work and open the Premises for business to the public fully fixtured, stocked and staffed on the Rent Commencement Date, and thereafter throughout the Term of Lease to actively and diligently conduct its business in a first class and reputable manner and continuously operate in one hundred percent (100%) of the space within the Premises for the Permitted Use, at a minimum, Monday through Saturday from 11:00 A.M. to 9:30 P.M. and on Sunday from 11:00 A.M. until 6:00 P.M., or such other operating days and hours as may be reasonably determined by Landlord for the operation of the Shopping Center.

Notwithstanding the foregoing, Tenant may be closed during certain of the hours above on a limited basis for (i) necessary repairs to the Premises or equipment located therein which require the closure of the Premises(provided such repairs are completed in accordance with the terms of this Lease, not to exceed ten (10) days in any Lease Year), (ii) training and inventory purposes (not to exceed three (3) days in any Lease Year), and (iii) Easter, Thanksgiving Day, Christmas Day and any other day the Shopping Center is not open for business (each, a "Permitted Closure"; collectively, the, "Permitted Closures"). Tenant shall provide Landlord at least ten (10) days' prior notice of such Permitted Closure (except for a closure in connection with subsection (iii), in which case no notice is required). Nothing herein shall excuse Tenant from paying Rents due during such Permitted Closure.

Tenant shall have no right to quit the Premises, cease to operate its business, or cancel or terminate this Lease, unless such right is expressly granted to Tenant herein.

14

Section 8.3 - Prohibitions on Use.

(a)      Tenant shall not use or permit or suffer the Premises, or any part thereof, to be used by anyone else or for any other business or purpose than that specifically defined and permitted by this Article VIII, and further provided, that Tenant shall not divert any portion of the Premises GLA for any other use other than the Permitted Use.

(b)      Tenant shall not permit the Premises to be used in violation of any Applicable Laws or in a manner which in the sole judgment of Landlord will injure the reputation of, be a nuisance or annoyance, or do damage to, the other tenants of the Shopping Center or Landlord, including, without limitation, the sale of patently offensive material and merchandise and the use of audio devices, flashing lights, machinery and equipment creating noise or odors, or the committing of acts, which will disturb, impair or interfere with the use and enjoyment by other tenants of their respective premises within the Shopping Center or in the treatment of its customers that results in multiple complaints.  Tenant covenants and agrees that it shall maintain appropriate noise levels with respect to its operations so as not to disturb other occupants of the Shopping Center.

Notwithstanding anything to the contrary contained in this Lease, Landlord acknowledges that Tenant's Permitted Use may involve music, cheering and other noises typical of a virtual reality experience center.  Accordingly, Tenant agrees that Tenant's Plans will provide for proper sound attenuation within the Premises (including, without limitation, the installation of a rubberized floor mat, if necessary) so that any noises or vibrations emanating from the Premises are minimized and do not create a nuisance within the Shopping Center; and Tenant agrees that throughout the Term of Lease it will maintain levels of sound within the Premises in accordance with this Section 8.3(b).  Tenant shall promptly take all reasonable and necessary measures necessary to correct such noise and/or vibration levels which violate this Section 8.4(b), including ceasing the activity causing such noise and/or vibration levels unless and until other equally effective corrective measures are implemented.

(c)      Tenant agrees not to use or allow the Premises to be used for any auction, fire, bankruptcy or "going out of business" sale unless ordered by a court of competent jurisdiction, after reasonable notice to Landlord and an opportunity by Landlord to be heard.

(d)      The Shopping Center is a non-smoking facility.  Accordingly, there shall be no smoking of tobacco products in the Shopping Center or within twenty-five feet (25') of any entryway or air intakes to the Shopping Center.

(e)      To Landlord's actual knowledge, without any further duty of investigation or inquiry, the Premises is not subject to any lease, covenant, agreement, declaration or restriction that would, if enforced, prohibit the operation of the Premises for the Permitted Use.

Section 8.4 - Manner of Operation of Business.

(a)      Tenant agrees that the above business is to be conducted in a reputable manner in keeping with good practices as established in the trade.  Tenant shall keep upon the Premises an adequate staff of employees and a full and complete stock of merchandise during business hours throughout the Term of Lease so as to ensure a maximum volume of business in and from the Premises.

(b)      Subject to Section 14.1, Tenant agrees to assume full responsibility at its own cost to keep and maintain the Premises neat, clean, in proper repair and décor, free from waste and

15

031

offensive odors, and in an orderly and sanitary condition, free of vermin, rodents, bugs and other pests.

(c)    Landlord and its agents shall have the right, but not the duty, to inspect the Premises at any time to determine whether Tenant is complying with the terms of this Lease. If Tenant is not in compliance with any of the terms of this Lease, Landlord shall have the right, but not the obligation, to immediately enter upon the Premises to remedy said non-compliance at Tenant's expense.    Landlord shall use its reasonable efforts to minimize interference with Tenant's business, but shall not be liable for any interference caused thereby.

Section 8.5 - Hazardous Materials.

(a)    Tenant shall not cause or permit any Hazardous Materials to be brought upon, kept, stored, utilized, disposed of or used in or about the Premises or Shopping Center by Tenant, its agents, employees, contractors or invitees.    This obligation shall survive the expiration or earlier termination of this Lease.    If Tenant breaches the obligations stated in the preceding sentence, or if the presence of Hazardous Materials on the Premises or Shopping Center caused or permitted by Tenant results in contamination of the Premises or Shopping Center, or if contamination of the Premises or Shopping Center by Hazardous Materials otherwise occurs for which Tenant is legally liable to Landlord for damages resulting therefrom, then in any of such events, Tenant shall indemnify, defend and hold Landlord harmless from any and all claims, judgments, damages, penalties, fines, costs, liabilities or losses (including, without limitation, the cost of clean-up, diminution in value of the Premises or Shopping Center, damages for loss of or restriction on the use of rentable or usable space or of any amenity of the Premises or Shopping Center, damages arising from any adverse impact on marketing of space, and sums paid in settlement of claims, attorneys' fees, consultant fees and expert fees) which arise during or after the Term of Lease as a result of such contamination.    This indemnification of Landlord by Tenant includes, without limitation, costs incurred in connection with any investigation and/or testing of site conditions or any clean-up, remediation, removal or restoration work required because of Hazardous Materials present in or on the Premises or Shopping Center.    Without limiting the foregoing, if the presence of any Hazardous Materials on the Premises or Shopping Center caused or permitted by Tenant results in any contamination of the Premises or Shopping Center, Tenant shall promptly take all actions at its sole expense as are necessary to return the Premises or Shopping Center to the condition existing prior to the introduction of any such Hazardous Materials to the Premises or Shopping Center.

(b)    Landlord represents and warrants to Tenant that, to Landlord's actual knowledge, without further investigation or inquiry, Landlord has not generated, stored or disposed of Hazardous Materials on the Premises or the Shopping Center in violation of Applicable Laws. Landlord shall hold harmless and defend Tenant from and against any and all claims, actions, losses, and expenses (including attorneys' and other professional fees) arising from any conduct, activity, act, omission, or operation involving the use, handling, generation, treatment, storage, disposal, or release of any Hazardous Materials in, from, or to the Premises or the Shopping Center, to the extent arising from the actions of Landlord, its employees, and/or contractors. Landlord's obligation to defend Tenant against any such claims relating to the existence of Hazardous Materials in, under or upon the Shopping Center shall include Landlord's obligation to retain counsel, consultants and experts of Landlord's choice, and Tenant shall not be entitled to reimbursement from Landlord in the event Tenant elects to retain counsel, consultants and experts independent of and in addition to those retained by Landlord. Tenant shall cooperate with Landlord in Landlord's defense or remedy of any such third party claims relating to Hazardous Materials found in, under or upon the Premises or the Shopping Center. In the event Landlord

16

032

shall settle any or all third party claims in which Tenant shall be named as a defendant, Tenant shall have no right to object to such settlement unless the terms of such settlement shall adversely and materially affect Tenant and/or its business operations within the Premises.

(c) "Hazardous Materials" shall mean any substances which are (i) defined under any Environmental Laws (as hereinafter defined) as a hazardous substance, hazardous waste, hazardous material, pollutant or contaminant; (ii) petroleum hydrocarbon, including crude oil, gasoline or diesel fuel, or any fraction thereof; (iii) hazardous, toxic, corrosive, flammable, explosive, infectious, radioactive, carcinogenic or a reproductive toxicant; or (iv) otherwise regulated pursuant to any Environmental Laws. "Environmental Laws" shall mean all federal, state/commonwealth and local laws, statutes, ordinances, regulations, rules, judicial and administrative orders and decrees, permits, licenses, approvals, authorizations and similar requirements of all federal, state/commonwealth and local governmental agencies or other governmental authorities pertaining to the protection of human health and safety of the environment now existing or later adopted during the Term of Lease.

Section 8.6 - Conditions for the Sale of Alcoholic Beverages.

Tenant agrees (a) to provide Landlord with a copy of the liquor license issued by the state/commonwealth and any other applicable governmental or quasi-governmental authority (the "Liquor Permits") prior to the sale of any alcoholic beverages in, to or from Premises, (b) to keep the Liquor Permits, at Tenant's sole cost and expense, in full force and effect during the Term of Lease, (c) to comply with all rules and regulations issued by the state/commonwealth and any local authority regarding the sale of alcoholic beverages in, to or from the Premises, (d) to comply with all rules and regulations issued by Landlord regarding the sale of alcoholic beverages in, to or from the Premises, which rules are subject to modification during the Term of Lease from time to time by Landlord upon notice to Tenant. In the event that Tenant fails to comply with the terms of this Section 8.6, then Tenant's right to serve alcoholic beverages in, to or from the Premises may be revoked by Landlord.

## ARTICLE IX

## TERM

Section 9.1 - Commencement Date Agreement.

At any time following the Effective Date, Landlord and Tenant may, upon written request to the other party, execute a supplemental agreement in a form for recording, setting forth the Rent Commencement Date and Term Expiration Date.

Section 9.2 - Holding Over.

If, at the expiration of the Term of Lease, Tenant continues to occupy the Premises with or without Landlord's consent, its tenancy shall become a month-to-month tenancy terminable by either party on thirty (30) days prior written notice to the other party. Tenant's month-to-month tenancy shall be subject to all terms and conditions of this Lease, excepting the Term of Lease, and Tenant shall be obligated to pay holdover Fixed Minimum Rent equal to one hundred fifty percent (150%) of the monthly Fixed Minimum Rent payable by Tenant immediately prior to expiration of the Term of Lease, plus all other charges due under this Lease. Tenant shall be further subject to any changes which Landlord has given Tenant, in writing, during any fifteen (15) day period for the following fifteen (15) day period. Notwithstanding anything contained herein to

17

033

the contrary, nothing contained in this Section 9.2 shall be deemed or construed to give Tenant the right to holdover.

Notwithstanding the foregoing, Tenant shall not be permitted to holdover if Landlord gives Tenant notice that Tenant may not holdover.

Section 9.3 - Expiration of the Term of Lease.

(a) This Lease shall expire on the Term Expiration Date without the necessity of any notice from either Landlord or Tenant to terminate same, and subject to Section 9.2, Tenant hereby waives notice to vacate or quit the Premises and agrees that Landlord shall be entitled to the benefit of all provisions under this Lease respecting the summary recovery of possession of the Premises from Tenant holding over to the same extent as if statutory notice had been given.

(b) For a period of three (3) months prior to the expiration of the Term of Lease, upon reasonable prior notice to Tenant, Landlord shall have the right and may show the Premises and all parts thereof to prospective tenants during normal business hours.

(c) Tenant shall deliver and surrender to Landlord possession of the Premises upon the Term Expiration Date or earlier termination of this Lease in as good condition and repair as the same shall be at the commencement of the Term of Lease, except for ordinary wear and tear and casualty loss. Tenant shall not be required to remove any components of Tenant's Work by the Term Expiration Date, or any alterations to the Premises that are were not identified by Landlord as required to be removed upon the Term Expiration Date. Notwithstanding the foregoing, Tenant shall remove any alterations identified by Landlord upon the installation thereof prior to the Term Expiration Date, and shall immediately repair any damage caused by such removal. If Tenant shall fail to remove such alterations, or Tenant's trade fixtures, equipment and other personal property ("Tenant's Property"), then Landlord may, at Landlord's option, retain either any or all of the property, and title thereto shall thereupon vest in Landlord without compensation to Tenant; or remove all or any portion of the Property from the Premises and dispose of the Property in any manner, without compensation to Tenant. In the latter event, Tenant shall, upon demand, pay to Landlord the actual expense of such removal and disposition and the repair of any damage to the Premises resulting from or caused by such removal. The obligations contained in this Section 9.3 shall survive the expiration or earlier termination of this Lease.

Section 9.4 – Gross Revenue Termination Right.

(a) Subject to the terms and conditions of this Section 9.4, Tenant shall have the one-time right, exercisable by written notice to Landlord during the first thirty (30) days after the expiration of the fifth (5th) Lease Year, to terminate this Lease (the "Gross Revenue Termination Right") if Tenant's Gross Revenue in the fifth (5th) Lease Year do not meet or exceed Two Million and 00/100 Dollars ($2,000,000.00) ("Gross Revenue Threshold"). If Tenant exercises the Gross Revenue Termination Right, then Tenant shall furnish to Landlord a statement certified by Tenant of the Gross Revenue made in, on and from the Premises for the fifth (5th) Lease Year, which shall accompany such written notice. In the event Tenant shall achieve Gross Revenue in the fifth (5th) Lease Year in excess of Two Million and 00/100 Dollars ($2,000,000.00), the Gross Revenue Termination Right shall be deemed null and void and of no further force and effect. The Gross Revenue Threshold shall be equitably reduced in the event the Premises is closed in accordance with the terms of this Lease during the aforementioned Lease Years, including, but not limited to, damage and destruction, or eminent domain. Termination of this Lease shall be effective one hundred eighty (180) days after Landlord's receipt of Tenant's written notice (the "Gross Revenue Termination Date"); provided, however, that Tenant shall pay to Landlord (i) all

18

sums due and owing by Tenant to Landlord up to and including the Gross Revenue Termination Date, and (ii) the unamortized portion of the Construction Allowance, said amortization to be computed based upon the Term of Lease commencing on the Rent Commencement Date, which amount shall be paid to Landlord on or before the Gross Revenue Termination Date. Any sums which have not been exactly determined by Landlord as of the Gross Revenue Termination Date shall be paid by Tenant to Landlord within fifteen (15) days after receipt by Tenant of a statement for said sums. The obligation of Tenant to pay any such sums shall survive the termination of this Lease. If Tenant has the right to exercise the Gross Revenue Termination Right and Tenant does not terminate this Lease within the thirty (30)-day period set forth herein, then Tenant shall be deemed to have waived its Gross Revenue Termination Right.

(b)      In recognition of Tenant's Gross Revenue Termination Right, Tenant agrees that if (i) Tenant fails to be open for business in the Premises in accordance with this Lease at any time from the Rent Commencement Date through the fifth (5th) Lease Year, (ii) Tenant or its principal shareholders, management employees, or any affiliate or subsidiary of Tenant, directly or indirectly shall operate, manage or have any interest in any other competing store or business (including a department or concession within another store) that has the same or similar Permitted Use within the Restricted Area (as hereinafter defined), (iii) the Premises is closed for any reason not otherwise permitted under this Lease at any time during the first five (5) Lease Years of the Term of Lease, or (iv) Tenant Defaults under this Lease, then Tenant shall be deemed to have waived the Gross Revenue Termination Right and the Gross Revenue Termination Right shall be deemed null and void and of no further force and effect.

ARTICLE X
RENT COMMENCEMENT DATE

Section 10.1 - Rent Commencement Date.

Should the Rent Commencement Date occur on a day other than the first day of a calendar month, Tenant shall be liable for Rents due for said partial month on a prorated basis based upon a thirty (30) day month.

Section 10.2 - Delay or Failure to Deliver Premises to Tenant.

(a)      Landlord estimates that it will deliver possession of the Premises to Tenant within five (5) days after the Effective Date (the "Estimated Delivery Date"). Landlord shall use reasonable efforts to deliver the Premises to Tenant on the Estimated Delivery Date; provided, however, in no event shall Landlord be liable to Tenant for any failure or delay by Landlord in delivering the Premises to Tenant on the Estimated Delivery Date. Except as expressly set forth in Section 10.2(b), neither this Lease nor the obligations of Tenant hereunder shall be affected by a postponement of delivery of the Premises to Tenant and Landlord shall not be subject to any liability for failure to make possession of the Premises available on any date certain, nor shall the same be deemed to extend the Term, and Tenant hereby waives all such liability. This Section 10.2 shall be deemed to be an express provision to the contrary of Section 223-a of the Real Property Law of the State of New York and any other law of like import now or hereafter in force.

(b)      In the event Landlord fails to deliver possession of the Premises to Tenant within two hundred seventy (270) days following the Effective Date, subject to a day-for-day extension due to force majeure and/or delays caused by Tenant or Tenant's agents, employees or contractors, then Tenant shall have the one-time right to terminate this Lease by delivering written notice to Landlord within ten (10) days after the expiration of such two hundred seventy (270)-day period. If Tenant elects to exercise the foregoing termination right, then (w) the effective date of

19

termination shall be ten (10) days after the date Landlord receives Tenant's written notice, (x) Landlord shall return the Security Deposit to Tenant, (y) Landlord shall reimburse Tenant for all reasonable costs incurred in preparing and performing under this Lease until such termination date, including, but not limited to, legal fees, architect fees, permitting costs and construction fees (collectively, the "Lease Expenses"), such Lease Expenses not to exceed Twenty-Five Thousand and 00/100 Dollars ($25,000.00), which shall be paid to Tenant upon receipt of Tenant's paid invoices evidencing such Lease Expenses, and (z) the parties will have no further rights or liabilities under this Lease, except for any obligations that expressly survive the expiration or earlier termination of this Lease.  If Tenant exercises this right to terminate and the Premises is delivered to Tenant on or prior to such effective termination date, then the termination shall be deemed rescinded and delivery shall be deemed timely made for purposes of this Section 10.2(b). In the event Tenant shall not terminate this Lease within the ten (10)-day period set forth above, then Tenant shall be deemed to have waived its right to terminate this Lease under this Section 10.2(b).

ARTICLE XI
RENT

Section 11.1 - Fixed Minimum Rent.

(a)      Tenant hereby covenants and agrees to pay to Landlord's authorized agent, at Address for Payment of Rents or at such other address as Landlord may, from time to time, designate in writing, without deduction or set-off and without demand, during each Lease Year of the Term of Lease, the Fixed Minimum Rent; said amount(s) to be due and payable in monthly installments, in advance, on the first day of each and every calendar month.  Tenant agrees at no time to pay Fixed Minimum Rent more than one (1) month in advance of its due date.

(b)      Notwithstanding anything in this Lease to the contrary, in the event Tenant fails to pay any Rents or any other amount(s) due and owing Landlord within five (5) days following the due date of said Rents, then Tenant shall pay a late charge equal to two percent (2%) per month of such monthly Rents or amount(s) due Landlord from the due date of said Rents or amount(s) plus the maximum lawful interest rate on any such sums due Landlord from the due date to the date of payment of such sums.  No breach of this Lease by Landlord shall relieve Tenant of its obligation and duty to pay all such charges when due under the terms of this Lease.  The parties hereby agree that such late charge represents a fair and reasonable estimate of the costs and expenses Landlord will incur by reason of late payment by Tenant.  Acceptance of such late charge by Landlord shall in no event constitute a waiver of Tenant's default with respect to such overdue amount, nor prevent Landlord from exercising any of the other rights and remedies granted in this Lease.

(c)      Fixed Minimum Rent shall include Tenant's contribution towards the costs for utilities serving the interior and exterior Common Areas, including, but not limited to, electric, telephone, gas, water and heating, ventilating and air-conditioning.  Landlord may, in Landlord's sole discretion from time to time, allocate the Fixed Minimum Rent paid by Tenant to the foregoing item and/or any other costs associated with the Shopping Center for Landlord's internal purposes, and as Landlord deems necessary, for the overall benefit and operation of the Shopping Center.

Section 11.2 - Percentage Rent.

(a)      Amount.  In addition to Fixed Minimum Rent, Tenant covenants and agrees to pay to Landlord's authorized agent, at the Address for Payment of Rents, or at such other address as Landlord may from time to time designate in writing, without deduction or set-off and without

20

demand, during each Lease Year of the Term of Lease, Percentage Rent in amount(s) equal to the percentage of Gross Revenue in excess of the applicable Annual Breakpoint.

(b)    Payment.

(i)    The Percentage Rent due for each Lease Year shall be payable by no later than the fifteenth (15th) day of the month immediately following the month in which Gross Revenue for the Lease Year exceeds the Annual Breakpoint for said Lease Year, and thereafter, any Percentage Rent due shall be paid monthly on all additional Gross Revenue made during the remainder of said Lease Year.  Said payments of Percentage Rent shall be made concurrently with the submission of Tenant's written statement of monthly Gross Revenue to Landlord as set forth in Section 11.2(e).

(ii)    Upon submission of Tenant's certified statement of Gross Revenue at the close of each Lease Year as provided herein, adjustments of amounts due for Percentage Rent shall be made to the respective parties.

(iii)    Notwithstanding the provision for the payment of Percentage Rent, Landlord shall not, in any event, be deemed to be a partner or associate of Tenant in the conduct of its business.  The relationship of the parties hereto shall, at all times, be solely that of Landlord and Tenant.

(c)    Gross Revenue.  "Gross Revenue" shall mean the total amount of all sales of merchandise and/or services and all other receipts of all business conducted in, at, or from any part of the Premises (including any sales made via personal computer located within the Premises, "Home Shopping" television sales, catalog, direct mail, telephone or electronic sales), whether the same be for cash, barter, credit, check, charge account, gift and merchandise certificates or other disposition of value regardless of collection, and whether made by Tenant, sub-tenants, concessionaires, licensees, or assignees of Tenant.  The value of each sale shall be the actual total sales price charged to the customer, and shall be reported in full in the month that the transaction occurs irrespective of when, or if, payment is received.  Gross Revenue shall include orders or sales which originate in, at, or from the Premises, whether delivery or performance is made from the Premises or from another place, and orders and sales of goods and services delivered and performed from the Premises as a result of orders taken elsewhere; orders or sales mailed, telephoned, or electronically submitted which are received at or filled from the Premises; and all sales and revenue accruing by means of mechanical, self-operated, or automatic vending devices if permitted on the Premises. There shall be no deductions or exclusions from Gross Revenue, except as specifically permitted hereafter.  Any deposit not refunded shall be included in Gross Revenue.

(d)    Exclusions from Gross Revenue.  Notwithstanding the foregoing, Gross Revenue shall not include: (i) merchandise returned in the amount of cash refunded, credit given, or discounts or allowances granted or exchanges made, provided that the sale price of said items was originally included in Gross Revenue; (ii) the amount of any sales, use or gross receipts tax, or excise tax imposed by any governmental authority directly on sales and collected from customers, provided the amount of such tax is separately recorded; (iii) the exchange of merchandise between stores of Tenant when such exchanges are made solely for the operation of Tenant's business and not for the purpose of consummating a sale which has been made in, at or from the Premises; (iv) merchandise returned for credit to shippers, jobbers, wholesalers or manufacturers; (v) revenue from the sale of trade fixtures after use in the Premises; (vi) sums or credits received in settlement of claims for loss or damage to merchandise; and/or (vii) revenue from vending machines for Tenant's employees use only.

21

(e)     Reporting.

(i)     On or before the fifteenth (15th) day of each month of each Lease Year, commencing in the second month of the first Lease Year, Tenant shall furnish to Landlord's authorized agent at the Address for Gross Revenue Reports, or at such other address as Landlord may, from time to time, designate in writing, a written statement signed by Tenant showing Tenant's Gross Revenue for the preceding calendar month.

(ii)    On or before the forty-fifth (45th) day following the close of each Lease Year, Tenant shall furnish to Landlord's authorized agent, at the Address for Gross Revenue Reports, a written statement certified by an officer of Tenant, or a certified public accountant employed by Tenant, of the Gross Revenue made in, at or from the Premises during the preceding Lease Year.

(iii)   For purposes of ascertaining the amount of reportable sales and revenue, Tenant agrees to record each and every sale at the time of the transaction (x on a cash register having a sealed, continuous cash register tape with cumulative totals, which numbers, records and duplicates each transaction entered into the register (in any event such cash register must have a non-resettable grand total); or (y) on serially pre-numbered sales slips; or (z) using point-of-sale recording techniques; all of the above to be in accordance with generally accepted accounting principles, consistently applied. Should Tenant elect (x) above, Tenant agrees that the continuous cash register tape will be sealed or locked in such a manner that it is not accessible to the person operating the cash register. If Tenant chooses to record each sale on individual sales slips, Tenant agrees that said sales slips (including those canceled, voided or not used) will be retained in numerical sequence.

(iv)    If Tenant shall fail to prepare and/or deliver any statement of Gross Revenue required herein, Landlord may do any or both of the following: (x) elect to treat Tenant's failure to report as a Default under this Lease; or (y) elect to make an audit of all books and records of Tenant which in any way pertain to Gross Revenue and to prepare the statement(s) which Tenant has failed to prepare and deliver. The statement(s) so prepared shall be conclusive on Tenant, and Tenant shall pay on demand all expenses of such audit and for the preparation of any such statement(s) and all sums as may be shown by such audit to be due as Percentage Rent.

(v)     All such monthly and annual statements and reports of Tenant's Gross Revenue shall be kept in confidence by Landlord, except in connection with a sale, mortgage, administrative or judicial proceedings.

(vi)    Upon Landlord's written request, but no more frequently than once per calendar year, Tenant agrees to furnish Landlord professionally prepared financial statements of Tenant's current financial condition.

(f)     Books and Records.

(i)     Tenant agrees to prepare and maintain for each Lease Year and to keep same at the Premises, or at its principal offices, accurate books and records of all business conducted at the Premises in accordance with generally accepted accounting principles consistently applied. Said books and records shall be open and available to Landlord or Landlord's representative for examination at all reasonable times and upon reasonable notice to Tenant for the purpose of ascertaining or verifying Tenant's Gross Revenue. Landlord shall also have the right to request such other records and/or accounts which Landlord may deem

22

necessary to accurately determine Gross Revenue. All books and records shall be retained by Tenant for examination by Landlord for a period of at least three (3) years following the end of the Lease Year for which said records apply.

(ii)     If upon inspection or examination of Tenant's books and records, Landlord determines that Tenant has failed to prepare and maintain the aforementioned books and records in the manner detailed herein, Landlord shall give Tenant sixty (60) days to cure said deficiencies and Tenant shall reimburse Landlord for all reasonable and actual expenses incurred by Landlord in determining said deficiencies, including, but not limited to, any audit or examination fees incurred by Landlord.

If after receiving the aforesaid notice, and upon expiration of the sixty (60) day time period specified above, Tenant fails to cure the noted deficiencies, Landlord may, at its option, elect to do one or more of the following: (y) grant Tenant additional time to cure the deficiencies; or (z) hold Tenant in Default of this Lease.

(iii)     In the event an examination of Tenant's books and records shall disclose a deficiency in excess of two percent (2%) of the Gross Revenue reported for any Lease Year where Percentage Rent is due Landlord, Tenant agrees to pay to Landlord (1) the actual and reasonable costs and expenses of such audit; and (2) any additional Percentage Rent found due and owing as a result of said audit, both of which shall be immediately paid by Tenant to Landlord upon demand. If an examination by Landlord or its representative(s) discloses that Tenant has over-reported Gross Revenue, and that as a result of said over-reporting, Tenant has overpaid Percentage Rent, Landlord shall give Tenant credit against the next due installment(s) of Rents due and owing by Tenant for such overpaid Percentage Rent.

Section 11.3 - Additional Rent.

(a)     Additional Rent will be applied by Landlord to the operation, maintenance, management, marketing and advertising of the Shopping Center. Allocation of Additional Rent among these costs may vary from year to year as Landlord, in the exercise of its reasonable business judgment, shall determine. Such Additional Rent shall be paid by Tenant to Landlord in equal monthly installments, in advance, on the first day of each calendar month during the Term of Lease in an amount equal to one-twelfth (1/12th) of the Additional Rent due for the applicable Lease Year. The amount due for any partial Lease Year shall be prorated accordingly.

(b)     Should any governmental authority having jurisdiction over the Shopping Center enact or impose any future law, ordinance, regulation or requirement ("Future Law") upon Landlord, the direct effect of which is to increase Landlord's cost of operating, maintaining and managing the Shopping Center ("Operating Costs"), as compared with Landlord's Operating Costs incurred for the calendar year immediately preceding the enactment of such Future Law by more than the annual percentage increase in the Additional Rent, then in such event, Landlord shall notify Tenant in writing of such increase ("Extraordinary Increase") and shall furnish Tenant with reasonably suitable documentary evidence of such Extraordinary Increase and whether or not it is one-time or ongoing. If the Future Law should result in a one-time Extraordinary Increase, Tenant's Proportionate Share of the Extraordinary Increase shall be divided into twelve (12) equal monthly increments, which shall be added to Landlord's monthly charge to Tenant for reimbursement to Landlord over the next twelve (12) month period. However, if the Future Law should result in an ongoing Extraordinary Increase over the remaining balance of the Term of Lease, Tenant's Proportionate Share of such Extraordinary Increase shall be added to Tenant's Additional Rent and all subsequent annual compounded increases shall be applied to the increased Additional Rent amount.

23

Section 11.4 - Real Estate Taxes.

(i)       The Rent to be paid under this Lease shall be paid to Landlord absolutely and without deduction for taxes of any nature whatsoever.

(ii)      Tenant shall pay Tenant's Fixed Share of Taxes to Landlord, as Rent, in accordance with **Exhibit E**, in equal monthly installments in advance on the first day of each calendar month, commencing on the Rent Commencement Date, in an amount equal to one-twelfth (1/12th) of Tenant's Fixed Share of Taxes due for the corresponding twelve (12)-month period set forth on **Exhibit E**. The amount due for any partial month shall be prorated accordingly.

(iii)     In addition to any other taxes (or any payments due on account thereof) due pursuant to this Lease, Tenant shall pay to the appropriate agency (or to Landlord as Rent if Landlord is charged with the responsibility of collecting such monies), prior to the time the same shall become delinquent or payable with penalty, (i) all sales, excise, business privilege, use and occupancy, special services district, and other tax levied, imposed or assessed by the state in which the Premises are located or any political subdivision thereof or other taxing authority upon any Rent payable hereunder (not including, however, Landlord's income taxes); (ii) all taxes and assessments upon or against the conduct of Tenant's business at the Premises including, but not limited to, business and occupation taxes and occupational license taxes; and (iii) all taxes imposed on Tenant's inventory, signs, furniture, fixtures, apparatus, equipment, alterations, betterments, and improvements (regardless of whether installed by Tenant or by Landlord on behalf of Tenant), and any other Tenant's personal property.

(iv)      If Tenant subleases all or a portion of the Premises: (i) Tenant will timely make all appropriate use and occupancy tax filings; (ii) Tenant will collect and timely pay over all appropriate use and occupancy taxes, and Tenant's failure to timely pay same shall constitute a default in the payment of Rent; (iii) Tenant will indemnify and hold harmless Landlord from all use and occupancy tax liabilities, interest, and penalties; (iv) Tenant's sublease with its subtenant will require the subtenant to pay the tax to Tenant; and (v) Tenant will notify Landlord of all subleases and provide copies of such subleases to Landlord to permit Landlord to make all appropriate use and occupancy tax filings.    Nothing herein shall modify any other provision of this Lease concerning restrictions on Tenant's ability to sublease the Premises.

(v)       Tenant shall pay any and all realty transfer taxes imposed upon or in connection with this Lease.

(vi)      Tenant's failure to pay any charges due pursuant to this Section 11.4, regardless of whether such charges are payable to Landlord or to a taxing authority or other third party, shall constitute a default in the payment of Rent.

Section 11.5 - Utility and Insurance Costs. [reserved]

Section 11.6 - Security Deposit.

Concurrently with its execution and submission of this Lease, Tenant shall deposit with Landlord and thereafter during the Term of Lease shall maintain on deposit with Landlord, without interest, the Security Deposit for the full, prompt and faithful performance by Tenant of all obligations hereunder.

It is also agreed between the parties herein that:

(a)      The Security Deposit or any portion thereof may be applied to the curing of any Default under this Lease that may exist, without prejudice to any other remedy or remedies which Landlord may have on account thereof, and upon such application, Tenant shall pay to Landlord on demand the amount so applied which shall be added to the Security Deposit so that same will be restored to its original amount;

(b)      Should the Premises be transferred by Landlord, the Security Deposit or any balance thereof may be turned over to Landlord's successor or transferee, and Tenant agrees to look solely to such successor or transferee for such application or return if the Security Deposit or balance thereof has been turned over to Landlord's successor or transferee. If the Security Deposit or balance thereof has not been turned over to Landlord's successor or transferee, the Tenant may look to the Landlord for application or return thereof;

(c)      Landlord or its successors shall not be obligated to hold the Security Deposit as a separate fund, but may commingle it with other funds; and

(d)      The Security Deposit, or any then remaining balance thereof, shall be returned to Tenant, without interest, within thirty (30) days after the Term Expiration Date; provided, however, Landlord may suspend the returning of same if Tenant is in Default, until Tenant has cured such Default.

ARTICLE XII
PREMISES UTILITY SERVICES

Section 12.1 - Utility Service Charges.

As part of the Rents provided for by this Lease, Tenant agrees to pay to Landlord, as hereinafter provided, the following utility service charges:

(a)      Water and Sewer Services.  Landlord shall make available water and sewer services to the Premises in the sizes and capacities as more specifically set forth in **Exhibit C**. Landlord shall have the option, exercisable by Landlord in its sole discretion, to (i) arrange with the local water and sewer utility company to furnish and supply water and sewer services to the Premises on a direct-metered basis; or (ii) furnish and supply water and sewer services to the Premises on a sub-metered basis, in which event Tenant agrees to purchase same from Landlord and shall pay Landlord for such services as part of Rents, on the first day of each month, in advance (prorated for partial months), commencing on the Rent Commencement Date. If Landlord elects to furnish water and sewer services to the Premises, charges for such services shall be billed to Tenant monthly based on sub-metered readings, adjusted quarterly.  Tenant's cost hereunder shall not exceed that which would be charged to Tenant from time to time by the utility company which would otherwise furnish water and sewer services to the Premises and metered same directly thereto.

(b)      Telephone/Internet Service.  Per **Exhibit C**, Landlord will provide and/or make available to the Premises the facilities necessary to enable Tenant to obtain telephone/Internet service for the Premises.  Tenant shall arrange for telephone/Internet service directly with the appropriate company supplying same to the Shopping Center at Tenant's sole cost and expense and shall pay all charges therefor directly to the providing company.

(c)      Gas Service.  To the extent such service may be necessary for the conduct of Tenant's business in the Premises, and to the further extent that it is feasible to run such service from the nearest available gas service point to the Premises, Tenant shall, at Tenant's sole cost

25

and expense, but subject to Landlord's prior approval,  arrange for such gas service with the utility company supplying same to the Shopping Center, including, but not limited to, any piping from such service point and metering related thereto.  Tenant shall pay all charges therefor directly to the providing utility.

(d)      Electricity Service.  Landlord has advised Tenant of the utility company which will provide or is presently providing electricity service to the Shopping Center ("ESP").  Tenant shall arrange with such ESP to furnish and supply Tenant's electricity service requirements directly to Tenant on a direct-metered basis and Tenant shall pay all charges therefor directly to the ESP. In the event that Tenant wishes to utilize services of an alternative electric service provider ("ASP") rather than the ESP servicing the Shopping Center as of the Effective Date, no such ASP shall be permitted to provide service to Tenant or to install its lines or other equipment within the Shopping Center without obtaining the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed.  Unless all of the following conditions are met to Landlord's reasonable satisfaction in a written agreement between the ASP and Tenant or by any other means reasonably acceptable to Landlord, it shall be reasonable for Landlord to refuse its consent: (i) Landlord shall incur no expenses whatsoever with respect to any aspect of ASP's provision of its services, including, without limitation, the cost of installation, service and materials; (ii) prior to commencement of any work in or about the Premises and/or Shopping Center by the ASP, the ASP shall supply Landlord with verification that, in Landlord's sole judgment, ASP is (a) properly insured, and (b) financially capable of covering any uninsured damage; (iii) prior to the commencement of any work in or about the Premises and/or Shopping Center by the ASP, the ASP shall agree, in writing, to abide by such rules and regulations, including job site rules, and such other requirements as reasonably determined by Landlord to be necessary to protect the interest of the Shopping Center; (iv) Landlord reasonably determines that there is sufficient space in the Shopping Center for the placement of all of ASP's equipment and materials, including, without limitation, the electricity risers; (v) ASP is, in Landlord's sole judgment, licensed and reputable as shown in documents acceptable to Landlord; (vi) ASP agrees, in a license agreement signed by Landlord and ASP, to compensate Landlord the amount determined by Landlord for (a) space used in the Shopping Center for the storage and maintenance of ASP's equipment ("ASP's Space"), and (b) all costs that may be incurred by Landlord in arranging for access by ASP's personnel, security for ASP's equipment, and any other such costs as Landlord may incur; (vii) ASP agrees that Landlord shall have the right to supervise ASP's performance of any work on or about the Shopping Center, including, without limitation, any installations or repairs; and (viii) ASP agrees that Landlord shall have the right to enter ASP's Space at any time in the event of an emergency and at all reasonable times and upon reasonable notice for the purpose of (a) inspecting same, (b) making repairs to ASP's Space and performing work therein as may be necessary, in Landlord's judgment, or (c) exhibiting ASP's Space for purposes of the sale or financing of the Shopping Center.

(e)      Heating, Ventilation and Air Conditioning System.  Tenant is to provide its own equipment and facilities for heating, ventilating and air-conditioning the Premises ("Premises HVAC System") described in **Exhibit C**.  Tenant shall operate and maintain same during the Term of Lease and such equipment shall belong to Landlord at the expiration or earlier termination of this Lease.

Section 12.2 - Discontinuance of Service.

Landlord reserves the right, with thirty (30) days prior written notice to Tenant, to disconnect or discontinue water, electricity, air conditioning, heating, ventilating or any other utility service without liability to Tenant whenever and during any period in which bills for same remain

26

unpaid by Tenant. Any such action by Landlord shall not be construed by Tenant or any other party interpreting this Lease as a constructive eviction or disturbance of possession of Tenant or an election by Landlord to terminate this Lease on account of such non-payment. If any such utility service is discontinued or disconnected by Landlord pursuant to the foregoing, any reconnection of such utility service shall be at Tenant's sole cost and expense.

## Section 12.3 - Interruption of Service.

Landlord shall not be liable or responsible for any loss, damage or expense that Tenant may sustain or incur by reason of any change, failure, disruption, or defect in the supply or character of any utility service furnished to the Premises, or if the quantity or character of any utility service is no longer available or suitable for Tenant's requirements, and no such change, failure, disruption, or defect shall constitute a constructive eviction or disturbance of possession of Tenant or entitle Tenant to any abatement or diminution of Rents or relieve Tenant of any of its obligations under this Lease. Notwithstanding the foregoing, provided that Tenant is in possession of the Premises and operating for the Permitted Use, if any interruption of utility services caused by Landlord's, its agents or contractors, willful acts or negligence shall continue for more than seventy-two (72) consecutive hours, and Tenant is reasonably precluded from doing business in the Premises, then Fixed Minimum Rent shall thereafter be abated in proportion to the square footage of the Premises that is closed for business due to such interruption until the earlier of the date (i) such interruption ceases, or (ii) Tenant reopens for business in the portion of the Premises closed for business, which abatement shall be Tenant's sole remedy.

## Section 12.4 - Premises Sprinkler System.

Tenant shall have the right to use the existing sprinkler connection for the Premises to Landlord's bulk main, if any (the "Existing Sprinkler System"), provided that the Existing Sprinkler System is in compliance with Applicable Laws and is adequately sized for Tenant's use. If, at any time during the Term of Lease, applicable codes or governing authorities require fire sprinkler protection for the Premises, or a modification to the existing protection, and Landlord has provided a connection for the Premises as provided above, Tenant shall, at Tenant's expense, install, extend to the Premises, and/or modify or revise within the Premises, the sprinkler system to include cross mains, branch lines, drops, head facilities for proper drainage and any necessary test valves, orifices or other fire protection equipment as may be required for the Premises, all of which shall comply with Landlord's fire and casualty insurer, all applicable codes and ordinances, the National Fire Protection Association No. 13 for ordinary hazard occupancies, the applicable Insurance Service Bureau, and Landlord's drawings, whichever is more stringent. Tenant's system shall be separate from other tenant systems via a separate connection to Landlord's bulk main and shall be water tested at a pressure of two hundred (200) psi for a period of two (2) hours in the presence of Landlord's representative.

Should the utility company furnishing water to the Shopping Center levy, assess or impose upon Landlord a sprinkler system backup charge, then Tenant shall pay to Landlord its proportionate share thereof, which shall be in an amount equal to the product obtained by multiplying said charge by a fraction, the numerator of which shall be the Premises GLA and the denominator of which shall be the gross leasable area in the Shopping Center served by such sprinkler system determined as of the date such charge is billed to Tenant; and shall be paid by Tenant within ten (10) days after billing by Landlord. In addition, Tenant shall be responsible for all sprinkler shut down fees assessed for any shut downs necessitated by Tenant's work on the sprinkler system.

## ARTICLE XIII

27

## SIGNS

Section 13.1 – Storefront Sign.

Tenant shall only erect such storefront sign(s) that have been previously approved in writing by Landlord in accordance with **Exhibit C** and Applicable Laws, including obtaining all permits and licenses for same, and Tenant shall maintain said storefront sign(s) in good condition and repair.  Tenant shall not exhibit or affix any other type of sign, decal, advertisement, notice or other writing, awning, antenna or other projection to the roof or the outside walls or windows of the Premises or the Shopping Center without Landlord's written consent.

Section 13.2 - Interior Signs and Advertising.

Tenant agrees that no advertising material of any kind, except temporary price tags related to merchandise on display in the Premises, shall be placed within four feet (4') of any customer door or lease line of the Premises or on the surface of any display window(s) or customer door of the Premises.  All window display advertising material and interior signs shall be in keeping with the character and standards of the Shopping Center as determined by Landlord and as more specifically described in **Exhibit C**, and Landlord reserves the right to require Tenant to correct any nonconformity.  Any such display(s) and sign(s) shall only be related to merchandising of goods and services from the Premises.

## ARTICLE XIV
## REPAIRS AND ALTERATIONS

Section 14.1 - Repairs by Landlord.

(a)     Landlord shall keep the roof (including interior ceiling damage by leakage), structural portions, the exterior of the Premises, parking facilities and other Common Areas, and utility systems to Tenant's point of connection, and those not exclusively serving the Premises, in good and tenantable condition and repair during the Term of Lease, subject to the provisions of Section 11.3 (including those repairs necessitated by the negligence or willful misconduct of Landlord and Landlord's employees, agents, or contractors); provided, however, that if the need for any such repair(s) is attributable to, or results from the operation or acts of, Tenant or its agents, or is Tenant's responsibility pursuant to the terms of this Lease, then in such event, Tenant does hereby agree to, and shall reimburse Landlord for, all reasonable and actual costs and expenses incurred by Landlord with respect to such repairs.  Tenant shall give Landlord written notice of the necessity for repairs coming to the attention of Tenant following which Landlord shall have a reasonable time to undertake and complete such repairs (not to exceed thirty (30) days, excepting any such repair that cannot reasonably be cured within said thirty (30)-day period, so long as Landlord has commenced such repair within the thirty (30)-day period and continues with diligence to complete).

(b)     As used in this Article XIV, the phrase "structural portions" and "exterior of the Premises" shall not be deemed to include the Premises storefront(s), plate glass, window case(s), window frame(s), door(s), door frame(s) or any alterations to the Premises required to comply with Applicable Laws.  It is expressly understood and agreed that Landlord shall be under no obligation to make any repairs, alterations, replacements or improvements to or upon the Premises resulting from compliance with the ADA.

(c)     Landlord shall not in any way be liable to Tenant for failure to make repairs as herein specifically required of Landlord unless (i) Tenant has previously notified Landlord in writing

28

044

of the need for such repairs; (ii) Landlord has failed to commence said repairs within the timeframe set forth in Section 14.1; and (iii) Landlord has not thereafter diligently pursued said repairs to completion.

(d)    If the replacement of any HVAC unit(s) is necessary in the last two (2) Lease Years of the Term of Lease (including any extension thereof), and Tenant has maintained such HVAC unit(s) in strict compliance with the terms of this Lease, then upon the expiration of this Lease, Landlord shall reimburse Tenant for the unamortized costs of such replacement HVAC unit(s), amortized on a straight-line basis over its useful life. Tenant's contribution towards such replacement HVAC unit(s) shall only apply to that portion of those costs applicable from installation through the expiration of the Lease Term (including any extension thereof), with Landlord reimbursing Tenant for the costs applicable to the period after the expiration of the Lease Term (including any extension thereof). If the Term of Lease is extended or Tenant holds over in the Premises so that Tenant remains in the Premises beyond the Term Expiration Date, then the expiration of the Lease Term shall mean such extended date and shall be used in calculating such two (2) Lease Year period.

Section 14.2 - Repairs by Tenant.

It shall be Tenant's sole responsibility, at its own expense, to keep and maintain its storefront(s) and the interior of the Premises in good condition and repair at all times. All repairs to the Premises, equipment or facilities therein or thereabout exclusively serving the Premises, other than those repairs required to be made by Landlord pursuant to Section 14.1, shall be made by Tenant. Said repairs shall include, but not be limited to, all necessary interior painting and decorating, maintenance, repair and/or replacement of the electrical, plumbing, sewer and heating, ventilating and air-conditioning systems to the point of common connection above and under the slab and elsewhere which exclusively serve the Premises, and any other mechanical and operational installations exclusively serving the Premises. All such repairs and replacements shall be made in a prompt manner so as to avoid creating additional damage and shall be in quality and class equal to the original construction.

Notwithstanding anything contained herein, Tenant shall, at Tenant's sole cost, repair or replace all glass contained in the Premises, including, but not limited to, all glass in doors, storefronts, windows and entrance and service doors.

Section 14.3 - Alterations and Remodeling.

(a)    Tenant, at its own expense, shall have the right to make such interior, non-structural alterations, changes and improvements to the Premises as Tenant may deem reasonably necessary for its use of the Premises; provided, however, that any alterations, changes and/or improvements of the interior of the Premises in excess of Ten and 00/100 Dollars ($10.00) per square foot of Premises GLA, and/or any material or structural alterations to the Premises, and/or changes in the electrical, heating, plumbing or ventilating and air-conditioning systems thereof, and/or changes to any fire sprinklers, shall not be made without Landlord's prior written consent.    Tenant shall submit to Landlord fifteen (15) days' written notice prior to undertaking any of the permitted interior, non-structural alterations, changes and improvements. Landlord's approval of Tenant's alterations shall, however, create no responsibility or liability on the part of Landlord for their completeness, design sufficiency or compliance with Applicable Laws as it is Tenant's responsibility to have such plans and specifications prepared in accordance with Applicable Laws. All such alterations, changes and improvements shall be made in accordance with the provisions of **Exhibit C** and shall become the property of Landlord upon installation and

29

045

shall remain upon and be surrendered with the Premises upon the expiration or earlier termination of this Lease.

(b)     Tenant further agrees not to make any alterations, additions or changes to any storefront sign, storefront, exterior wall or roof of the Premises, nor shall Tenant erect any mezzanines or increase the size of same if existing unless and until the prior written consent of Landlord shall first have been obtained.  In no event shall Tenant make or cause to be made any penetration through the roof or floor slab of the Premises without the prior written consent of Landlord.  Tenant shall be directly responsible for any and all damages resulting from any violation of the provisions of this Section 14.3.

## ARTICLE XV
## LIENS

Section 15.1 - Lien Indemnification by Tenant.

Nothing contained in this Lease shall be deemed or construed in any way as constituting the consent or request of Landlord, express or implied, by inference or otherwise, to any contractor, subcontractor, laborer or materialman for the specific performance of any labor or the furnishing of any materials or equipment for any specific improvement, alteration to or repair of the Premises or any part thereof, nor as giving Tenant any right, power or authority to contract for or permit the rendering of any services or the furnishing of any materials on behalf of Landlord that would give rise to the filing of any lien against the Premises or the Shopping Center.

Tenant shall allow no liens to be filed against the Premises or the Shopping Center as a result of work performed at the request or on behalf of Tenant.  Tenant shall indemnify and save harmless Landlord against all loss, liability, costs, attorneys' fees, damages and interest charges incurred as a result of any mechanic's lien or any other claim filed against the Shopping Center, the Premises, or Tenant's leasehold estate therein as a result of acts or omissions of Tenant or its agents, contractors and employees.

If any lien or notice of lien on account of an alleged debt of Tenant or any other claim is filed against the Premises or any part of the Shopping Center, Tenant shall, within thirty (30) days of the filing thereof, cause the same to be discharged of record by payment, deposit, bond or other security acceptable to Landlord.  Tenant shall have the right at all times and at its own expense to contest and defend on behalf of Tenant or Landlord any action involving the collection, validity or removal of any such lien upon giving adequate security to Landlord for discharge of such lien.

## ARTICLE XVI
## INDEMNITY AND INSURANCE

Section 16.1 - Indemnification.

(a)     Tenant shall defend, indemnify and save Landlord harmless from any legal action, damages, loss, liability and any other expense (including reasonable attorneys' fees), in connection with loss of life, bodily or personal injury or property damage arising from or out of the acts, failures, omissions or negligence of Tenant, its agents, employees or contractors which occur in the Premises, Common Areas or other parts of the Shopping Center, unless such legal action, damages, loss, liability or other expense (including reasonable attorneys' fees) results from any sole act, omission or negligence of Landlord, its respective agents, contractors or employees.

30

(b)     Landlord shall indemnify and save Tenant harmless from any legal action, damages, loss, liability and any other expense (including reasonable attorneys' fees) in connection with the loss of life, bodily or personal injury or property damages, arising from or out of the acts, failures, omissions or negligence of Landlord, its agents, employees or contractors which occur in the Premises, Common Areas or other parts of the Shopping Center, unless such legal action, damages, loss, liability or other expense (including reasonable attorneys' fees) results from any sole act, omission or negligence of Tenant, its respective agents, contractors or employees.

Section 16.2 - Tenant's Insurance Requirements.

(a)     Tenant covenants and agrees that from and after the date that Landlord delivers possession of the Premises to Tenant, and continuing throughout the Term of Lease, Tenant will carry and maintain, at its sole cost and expense, the following types of insurance, naming Tenant, Landlord, QIC US Management, Inc., QIC Properties US, Inc., and any other entities reasonably requested by Landlord, as insureds, in the following amounts:

(i)     Commercial General Liability Insurance. Tenant shall at all times keep and maintain in full force and effect commercial general liability insurance, which shall include broad form property damage liability coverage, extended bodily injury coverage, advertising injury liability coverage, contractual liability coverage and independent contractors coverage, in an amount not less than Two Million and 00/100 Dollars ($2,000,000.00), adjusted annually for inflation, written on a combined single limit per occurrence basis for property damage, personal injury and bodily injury or death of one or more persons.

(ii)     Workers' Compensation Insurance.     Tenant shall procure worker's compensation insurance as required by law, including employer's liability insurance (stop-gap), in an amount not less than One Million and 00/100 Dollars ($1,000,000.00).

(iii)     Personal Property, Alterations, Improvements and Betterments. Tenant shall at all times maintain in full force and effect special form insurance, including coverage for sprinkler damage, vandalism, and malicious mischief covering all of Tenant's personal property and alterations, improvements and betterments to the Premises, including plate glass, now existing or later added, to the extent of full replacement cost as updated from time to time during the Term of Lease. Tenant shall also procure business interruption insurance (loss of rents) for a period of not less than twelve (12) calendar months per occurrence.

The proceeds of Tenant's insurance, to the extent of the cost of any damage or loss to the Premises, shall be used for the repair and replacement of the property damaged or destroyed. If Tenant fails to commence, within thirty (30) days of availability of such insurance proceeds, and to diligently proceed to reconstruct or repair its portion of the damaged or destroyed Premises to its former condition prior to said casualty, then in such event, Landlord shall have the right to make all necessary repairs. If the insurance proceeds described above are not sufficient to cover said repairs, Tenant shall be liable for all additional costs in excess of such available insurance proceeds. However, it is expressly understood and agreed that Landlord shall be under no obligation to insure, reinstall, repair or replace any such alterations, additions, improvements or betterments. This paragraph is only applicable if this Lease is not terminated pursuant to Article XXI.

31

047

(iv)    Environmental Impairment Liability Insurance.  If Tenant uses, stores, handles, processes or disposes of Hazardous Materials (as hereinafter defined) in the ordinary course of its business, then Tenant shall maintain in full force and effect throughout the Term of Lease, Environmental Impairment Liability Insurance with limits of not less than One Million and 00/100 Dollars ($1,000,000.00), providing coverage for bodily injury, property damage or injury or damage of actual, alleged or threatened emission, discharge, dispersal, seepage, release or escape of Hazardous Materials, including any loss, cost or expense incurred as a result of any clean-up of Hazardous Materials or in the investigation, settlement or defense of any claim, suit, or proceedings against Landlord or its management company arising from Tenant's use, storage, handling, processing or disposal of Hazardous Materials.

(v)    Liquor Liability Insurance.  If Tenant is permitted hereunder to distribute, sell, serve or furnish alcoholic beverages in the ordinary course of its business, Tenant shall maintain and keep in full force and effect throughout the Term of Lease, liquor liability insurance in an amount not less than Three Million Dollars ($3,000,000.00) written on a combined single limit per occurrence basis ("Liquor Liability Insurance").

(b)    Additional Hazards.  Tenant agrees that it will not keep, use, sell or offer for sale in or upon the Premises any article which may be prohibited by special form insurance coverage. In addition, Tenant shall use best efforts not to keep, use or offer for sale in or upon the Premises any article which may increase the premiums for special form insurance coverage.  In the event of an increase in special form insurance coverage pursuant to the above, Tenant agrees to pay such increase in premium resulting from the keeping, use, sale or offering for sale of any such prohibited articles that may be charged during the Term of Lease for the amount of any insurance which may be carried by Landlord on the Shopping Center.  Said additional premiums shall be payable by Tenant to Landlord within ten (10) days following written notice from Landlord.

(c)    Blanket Policies.  Tenant may maintain any of its required insurance coverages under blanket policies of insurance covering the Premises hereunder and other property, provided that the minimum limits required herein are provided under such policies.

(d)    Certificate(s) of Insurance.  Tenant agrees to provide to Landlord certificate(s) of insurance with respect to the above-mentioned policies prior to occupancy and at least annually thereafter.  The coverage evidenced by such certificate(s) of insurance will be with insurance company(s) acceptable to Landlord, licensed to do business in the state/commonwealth where the Shopping Center is located, and rated at least A/X in the most current edition of Best's Insurance Report.  All such certificate(s) of insurance must provide that the required insurance coverage will be for a period of not less than one (1) year and must further provide that Landlord be given written notice at least thirty (30) days prior to any material alteration, expiration, cancellation, non-renewal or replacement of such existing insurance coverage.  Should Tenant fail to furnish any such notice or certificate(s) of insurance as provided hereunder, Landlord may obtain such insurance on behalf of Tenant and the premiums of same shall be deemed to be part of the Rents payable by Tenant to Landlord and Tenant shall reimburse Landlord for same within ten (10) days following Tenant's receipt of an invoice therefor from Landlord.

(e)    Notice of Loss.  Tenant shall promptly notify Landlord forthwith in the event of any damage to property or injury to person(s) occurring on the Premises from fire, water, or any other casualty, and further shall take immediate action to mitigate further damage.

Section 16.3 - Waiver of Subrogation.

32

Notwithstanding anything to the contrary contained elsewhere in this Lease, or prohibited by law, neither Landlord nor Tenant shall be liable to the other party or to any insurance company insuring the other party by way of subrogated rights or otherwise, for any loss or damage caused by fire or any other hazard or peril covered by fire and extended coverage or special form insurance coverage, to the extent such loss or damage is covered by insurance to any building structure or other tangible property, or any resulting loss of income, even though such loss or damage may have been occasioned by the negligence of such party, its agents or employees.

Section 16.4 - Landlord Not Responsible for Acts of Others.

Landlord shall not be responsible or liable to Tenant, or those claiming by, through or under Tenant, for any loss or damage to person(s) or property resulting from the acts or omissions of persons occupying space adjoining or adjacent to the Premises or connected to the Premises or any other part of the Shopping Center caused by, but not limited to, events such as the breaking or falling of electrical cables or wires, or the breaking, bursting, stoppage or leaking of water, gas, sewer or steam pipes or loss of HVAC.  None of the above events shall constitute an actual or constructive eviction, in whole or in part, or entitle Tenant to any abatement or diminution of Rents, or relieve Tenant from any of its obligations under this Lease. The foregoing shall not be construed to release or relieve Landlord from any loss or damage to the extent the same may be caused by Landlord's negligence or the negligence of Landlord's agents, employees or contractors to the extent Landlord may be vicariously liable for their acts or omissions; provided, however, that in the event such loss is insured against by Tenant or required hereunder to be covered by Tenant, Tenant shall look to its insurer for such loss as required in the Waiver of Subrogation set forth in Section 16.3.

Section 16.5 - Landlord's Insurance.

Landlord covenants and agrees that from and after the date of delivery of the Premises from Landlord to Tenant, and during the Term of Lease or any renewal thereof, Landlord will carry and maintain, with regard to the Shopping Center, the following types of insurance, in the amounts specified and in the form hereinafter provided for with insurance companies authorized to do business in the state in which the Premises is located and rated A/VII or better in the most current edition of Best's Insurance Report:

(a)    Commercial General Liability Insurance.  Landlord shall keep and maintain in full force and effect commercial general liability insurance in an amount not less than $3,000,000, adjusted annually for inflation, written on a combined single limit per occurrence basis for property damage and personal and bodily injury or death of one or more persons.

(b)    Property Damage Insurance. Landlord shall, at all times, keep and maintain in full force and effect special form policy(s) of insurance, including coverage for sprinkler damage, vandalism and malicious mischief, covering the roof, structural portions and perimeter walls of the Shopping Center and equipment (excluding Tenant's fixtures, merchandise, personal property, wall coverings, alterations, improvements, betterments and any other item included in Tenant's insurance) in an amount not less than full replacement cost (exclusive of the cost of excavations, foundations and footings).

(c)    Blanket Policies.  Landlord may maintain any of its required insurance under blanket policies of insurance covering the Premises and any other premises of Landlord or companies affiliated with Landlord, provided that the coverage afforded will not be reduced or diminished by reason of the use of such blanket policy of insurance.

33

## ARTICLE XVII
## GENERAL PROVISIONS

Section 17.1 - <u>Rules and Regulations</u>.

Landlord reserves the right, at any time and from time to time, to impose reasonable rules and regulations for the general welfare of the Shopping Center governing the conduct of tenants and the use thereof of the Common Areas for, without limitation, the avoidance of nuisance, and the maintenance of a good reputation, safety, order and cleanliness of the Premises and Shopping Center. Tenant agrees to comply with such rules and regulations imposed by Landlord as if same had existed and been attached hereto on the Effective Date. Tenant shall comply with, and cause its concessionaires, officers, employees, agents, customers and invitees to comply with, the Rules and Regulations of the Shopping Center annexed hereto as **Exhibit D** and with such additional reasonable rules and regulations promulgated by Landlord (so long as same are of generally uniform application) governing the conduct of tenants and the use of the Common Areas in the Shopping Center (the "<u>Rules and Regulations</u>"). In the event of a conflict between the terms and provisions of this Lease and any such rules or regulations, the terms and provisions of this Lease shall govern and prevail.

Section 17.2 - <u>Rubbish</u>.

Tenant agrees to maintain the Premises, at its expense, free and clear of all rubbish, garbage and trash in containers permitted and/or required by Landlord. Tenant, at its own expense, shall dispose of all said rubbish, garbage and trash as directed by Landlord. In the event Tenant requires the services of a trash compactor, Tenant shall arrange for and coordinate said services through Landlord's Shopping Center manager. If Tenant is required to use the Shopping Center's trash compactor services, the charge for such services shall be competitive with the prevailing market rate for same.

Section 17.3 - <u>Lighting</u>.

Tenant agrees to keep the windows of the Premises properly displayed and the Premises signs and external lights, where specifically permitted, properly illuminated during the hours established by the rules and regulations of Landlord for the Shopping Center.

Section 17.4 - <u>Merchandise Display, Loading and Unloading</u>.

Tenant agrees not to display goods or merchandise outside the Premises, and to load, unload and/or deliver goods and merchandise only at such times and in such areas and through such entrances as shall be designated by Landlord.

Section 17.5 - <u>Obstruction of Passageways</u>.

Tenant agrees not to obstruct any passageways, driveways, approachways, walks, roadways, exits or entrances in, to, from or through the Common Areas or any other portion of the Shopping Center.

## ARTICLE XVIII
## SUBORDINATION AND ATTORNMENT BY TENANT

Section 18.1 - <u>Subordination of Lease</u>.

34

(a)     This Lease and the estate of Tenant hereunder shall be subject and subordinate to any ground lease, deed of trust, mortgage lien or charge ("Mortgage") and any reciprocal easement agreement or other operating agreement or easement ("REA") which may now encumber or which at any time hereafter may encumber all or any portion of the Shopping Center (such Mortgage and REA and any replacement, renewal, modification, consolidation or extension thereof is collectively "Encumbrance").  Any Encumbrance shall be prior and paramount to this Lease and to the right of Tenant hereunder and all persons claiming through and under Tenant, or otherwise, in the Premises.  Tenant's acknowledgement and agreement of subordination provided for in this Section 18.1 shall be self-operative, and no further instrument of subordination shall be required.  However, Tenant covenants and agrees that, from time to time and at the request of Landlord or at the request of the holder of any Encumbrance, it will execute and deliver any instruments or certificates reasonably necessary to subordinate this Lease to such Encumbrance(s) or acknowledge or confirm the priority of any Encumbrance over this Lease' or to evidence Tenant's consent to an Encumbrance; the instrument subordinating this Lease to any Mortgage shall be in the lender's customary form.  Notwithstanding the foregoing, any holder of an Encumbrance may elect that this Lease shall have priority over such Encumbrance, and upon notification of such election by the holder of such Encumbrance, this Lease shall be deemed to have priority over such Encumbrance, whether this Lease is dated prior to or subsequent to the date of such Encumbrance.

(b)     Notwithstanding the foregoing, Tenant's subordination hereunder shall be subject to the condition that the holder of any Encumbrance not of record as of the Effective Date to which this Lease is to be subordinated, agrees that Tenant's use, occupancy and quiet enjoyment of the Premises will not be diminished or disturbed as a result of the holder of such Encumbrance becoming the owner of the Shopping Center, whether by foreclosure, deed in lieu of foreclosure or otherwise, provided Tenant is not in Default.

Section 18.2 - Attornment by Tenant.

Tenant agrees that if the holder of any Encumbrance or any person claiming under said Encumbrance shall succeed to the interest of Landlord in this Lease, or in the event any ground lease is terminated, Tenant shall recognize and attorn to the successor holder as Landlord under the terms of this Lease.  Tenant agrees that it will, upon the request of Landlord, execute, acknowledge and deliver any and all instruments necessary or desirable to give effect or notice of such attornment and failure of Tenant to execute any such document or instrument on demand shall constitute a Default by Tenant under the terms of this Lease.  In the event of any action for the foreclosure of the Mortgage, or in the event of the termination or expiration of any ground lease, this Lease shall not terminate or be terminable by Tenant hereunder by reason of such foreclosure of the Mortgage or termination of any such ground lease unless Tenant is specifically named and joined in any such action and unless a judgment is obtained therein against Tenant.

Section 18.3 - Landlord as Attorney-in-Fact for Tenant.

If Tenant, within twenty (20) days after submission of any instrument, fails to execute same, Landlord is hereby authorized to execute same as attorney-in-fact for Tenant.

## ARTICLE XIX
## RIGHTS OF LANDLORD

Section 19.1 - Landlord's Right to Repair.

35

Landlord, or its authorized agent(s), after reasonable prior written notice to Tenant, may go upon and inspect the Premises or any portion of the Shopping Center, and if Tenant has failed to commence any repairs required to be made by Tenant pursuant to the terms of this Lease within ten (10) days following receipt of written notice from Landlord, Landlord may, at its option, cause such repairs to be performed which are Tenant's obligation to perform and which Tenant has failed to do. Said work performed by Landlord shall be chargeable to Tenant and shall be due and payable to Landlord within ten (10) days following receipt of Landlord's billing.

Section 19.2 - Landlord's Right to Affix to Exterior.

Landlord shall have the right to install or place upon, or affix to, the roof and exterior wall(s) of the Premises, mechanical, electrical or other equipment, non-competitive signs, displays, antennas, satellite dishes, and any other objects or structures, provided same shall not materially impair the structural integrity of the building or interfere with Tenant's occupancy.

Section 19.3 - Landlord's Right to Make Payments on Behalf of Tenant.

Landlord shall have the right, but not the obligation, to make payments on behalf of Tenant where Tenant is in Default thereof under the terms of this Lease. Said payments by Landlord shall be considered part of Rents and shall be due and payable by Tenant within ten (10) days following Tenant's receipt of Landlord's billing therefor.

## ARTICLE XX
## ASSIGNMENT AND SUBLETTING

Section 20.1 - Landlord's Consent Required.

(a)     Landlord has entered into this Lease with Tenant in order to obtain the benefit for the Shopping Center of the unique attraction of Tenant's Trade Name and of the unique merchandising mix and product line associated with the business operated by Tenant under such Trade Name. In entering into this Lease, Landlord has specifically relied on the identity and special skill of Tenant in its ability to conduct the Permitted Use. Accordingly, Tenant shall not mortgage, pledge, encumber, franchise, assign or in any other manner transfer this Lease, voluntarily or involuntarily, by operation of law or otherwise, nor sublet all or any part of the Premises for the conduct of any business by a third person or business entity, or for any purpose other than expressly authorized herein without Landlord's prior written consent.

(b)     Any consent by Landlord to any assignment or subletting of the Premises, or other operation by a concessionaire or licensee, shall not constitute a waiver of the necessity for such consent under any subsequent assignment or subletting or operation by a concessionaire or licensee.

(c)     Reference anywhere else in this Lease to any assignee or subtenant shall not be considered as a consent by Landlord to such assignment or subletting nor as a waiver against same, except if specifically permitted otherwise in this Article XX.

(d)     Landlord and Tenant agree that Tenant shall have the burden of proving that Landlord's consent to the proposed Transfer was withheld unreasonably. Landlord shall have no liability to Tenant or to any proposed transferee in damages if it is adjudicated that Landlord's consent shall have been reasonably withheld.

Section 20.2 - Insolvency Proceedings.

36

052

In the event an assignment of the Premises is caused by operation of law due to Tenant's voluntary or involuntary insolvency proceedings under the Bankruptcy Reform Act of 1978, as amended, said assignment shall be subject to any and all conditions contained in Section 365 of said act or any other section pertaining to the termination, assumption, assignment or rejection of executory contracts for leases.

Section 20.3 - Transfer of Corporate Shares.

In the event Tenant is a "closely-held" corporation (meaning a corporation which is not listed on a national securities exchange as defined in the Securities Exchange Act of 1934, as amended), a change in the control (as hereinafter defined) of Tenant without Landlord's prior written consent shall constitute an assignment in violation of this Lease, and Landlord shall, at Landlord's election, be entitled to deem Tenant in Default under this Lease. As used herein, "control" shall mean the ownership or control of more than fifty percent (50%) of Tenant's stock.

Section 20.4 - Assignment to Related Entity.

Notwithstanding the foregoing provisions, Tenant shall have the right to assign or otherwise transfer this Lease or to sublet the Premises, without first obtaining Landlord's prior, written permission, to any (a) parent corporation of Tenant; or (b) wholly owned subsidiary or affiliate of Tenant or Tenant's parent corporation; (c) corporation which is wholly owned by the same corporation which wholly owns Tenant; (d) an entity with which Tenant is merged or consolidated with Tenant or Tenant's parent corporation; or (e) any entity which purchases all or substantially all of Tenant's assets by stock purchase or otherwise; provided, however, that in any of such events (i) Tenant and Guarantor(s) (if any) shall remain primarily liable for all obligations under this Lease; (ii) the transferee shall, prior to the effective date of the transfer, deliver to Landlord instruments, in written form acceptable to Landlord, evidencing such transfer and its agreement to assume and be bound by all terms, conditions and covenants of this Lease to be performed by Tenant; (iii) Tenant shall not be in Default under any provisions of this Lease; and (iv) Tenant's right to make such transfer is expressly conditioned on and shall remain in effect only as long as the transferee maintains its relationship as a parent corporation or affiliate or wholly owned subsidiary of Tenant or affiliate or wholly owned subsidiary of Tenant's parent corporation. Any transfer of the stock of such parent or subsidiary transferee shall be deemed a change in the control of Tenant and governed by the provisions of Section 20.3 above, unless such parent corporation or subsidiary transferee is not a closely-held corporation.

Section 20.5 - Transfer of Other Business Interests.

If Tenant is a general or limited partnership, or is a limited liability company, or any other type of business entity other than a corporation, and if at any time during the Term of Lease, the person(s) who at the time of the Effective Date owns the general partners' interest in such limited partnership or owns a controlling partnership interest in such general partnership, or is the managing member of the limited liability company, or a majority shareholder of any other business entity other than a corporation, ceases to own such interest, such cessation of ownership shall constitute an assignment of this Lease (except as a result of transfers by bequests or inheritance).

Section 20.6 - Acceptance of Rents by Landlord.

If this Lease is assigned, or if the Premises or any part thereof is subleased or occupied by a third party, other than Tenant, with or without Landlord's consent, Landlord may collect from such assignee, subtenant or occupant, any Rents or other charges payable by Tenant under this Lease and apply the amount collected to Rents herein reserved, but such collection by Landlord

37

shall not be deemed a waiver of any provisions of this Lease, nor acceptance of said assignee, subtenant or occupant as a tenant of the Premises.

Section 20.7 - No Release of Liability.

(a)     Except as otherwise expressly set forth in this Section 20.7, no assignment of this Lease  or subletting of the Premises or any other transfer by Tenant, either with or without Landlord's consent, required or otherwise, during the Term of Lease shall release Tenant or Guarantor(s) (if any) from any liability under the terms of this Lease nor shall Tenant or Guarantor(s) (if any) be relieved of the obligation of performing any of the terms, covenants and conditions of this Lease.

(b)     Upon an approved assignment of this Lease by Landlord pursuant to Section 20.1, or in connection with a valid assignment pursuant to Section 20.4, Tenant and Guarantor(s) (if any) shall be released from liability accruing after the Release Date (as hereinafter defined) if such transferee has a tangible net worth equal to greater than the greater of (i) the tangible net worth of Tenant and Guarantor(s) as of the date of such transfer, or (ii) Ten Million and 00/100 Dollars ($10,000,000.00).  Tenant shall provide written evidence of such transferee's net worth together with the request for such assignment (if requested pursuant to Section 20.1) or with the notice of such transfer (if pursuant to Section 20.4), as applicable.  As used herein, the "Release Date" shall mean twelve (12) months following the later of (1) the date of such transfer and (2) Landlord's receipt of written evidence of such tangible net worth, provided Tenant has not been in Default.

Section 20.8 - Administrative Fee.

Tenant shall pay Landlord an administrative fee of One Thousand Dollars ($1,000.00) or such other amount as Landlord shall reasonably determine to be reasonably appropriate in order to compensate Landlord for the time and expense of reviewing, processing and documenting Tenant's request that Landlord consent to any proposed assignment or subletting.    Such processing fee shall be paid to Landlord at the time that Tenant requests Landlord's consent hereunder and shall be payable to Landlord whether or not Landlord consents to Tenant's request and whether or not said proposed assignment or subletting actually occurs.

ARTICLE XXI
DAMAGE OR DESTRUCTION

Section 21.1 - Landlord's Obligation to Repair and Reconstruct.

(a)     If the Premises shall be partially damaged by fire or other casualty insurable under standard special form insurance but are not thereby rendered untenantable in any manner, Landlord shall cause the Premises to be repaired, subject to Sections 21.1 (c) and (d), and Rents shall not be abated.    If by reason of such occurrence, the Premises shall be rendered untenantable only in part, Landlord shall cause the Premises to be repaired, subject to Sections 21.1 (c) and (d), and Rents shall be abated proportionately as to the portion of the Premises rendered untenantable from the date of the casualty until the earlier to occur of (i) one hundred fifty (150) days after Landlord's restoration work has been substantially completed; or (ii) the date the Premises so repaired has re-opened for business.

(b)     If the Premises shall be rendered wholly untenantable by reason of such occurrence and the remainder of the Term of Lease is two (2) years or more, Landlord shall cause the Premises to be repaired in accordance with Section 21.1(c) (subject to reasonable delays

38

occasioned by adjustment of losses with insurance carriers or for any other cause beyond Landlord's control), and Rents shall be abated until the earlier to occur of (i) one hundred fifty (150) days after Landlord's restoration work has been substantially completed; or (ii) the date the Premises so repaired has re-opened for business.

(c) If Landlord is required or elects to repair or reconstruct the Premises under the provisions of this Article XXI, its obligation shall be limited to restoring the Premises to the condition it was in when possession was delivered to Tenant for the commencement of its leasehold improvement work. Tenant, at Tenant's expense, shall promptly perform all repairs and restoration not required to be done by Landlord herein and shall promptly re-fixture and reconstruct the Premises and recommence business in all parts thereof.

(d) Tenant shall not be entitled to any compensation or damages, other than stated herein, from Landlord for the loss of use of the whole or any part of the Premises or damage to Tenant's personal property or any inconvenience or annoyance occasioned by such damage, repair, reconstruction or restoration.

Section 21.2 - Option to Terminate.

(a) Landlord may elect to terminate this Lease if (i) the Premises are rendered wholly untenantable or damaged as a result of any cause which is not covered by Landlord's insurance; or (ii) the Premises are damaged or destroyed in whole or in part during the last two (2) years of the Term of Lease; or (iii) the Shopping Center is damaged to the extent of fifty percent (50%) or more of the gross leasable area thereof. In any of the above events, Landlord shall give Tenant notice of its election to terminate this Lease pursuant to the above within ninety (90) days after the occurrence of the applicable event. If such notice is given, this Lease shall terminate as of the date of such notice, and Rents shall be adjusted as of the date of such termination.

(b) Tenant hereby waives any statutory rights of termination which may arise out of partial or total destruction of the Premises which Landlord is obligated to restore. Notwithstanding the foregoing, Tenant may elect to terminate this Lease if Landlord elects to repair or rebuild the Premises, and such repairs are not substantially complete within two hundred seventy (270) days following the receipt of insurance proceeds from such fire or casualty. If Tenant elects to terminate the Lease, then Tenant shall provide written notice to Landlord within ten (10) days following the expiration of the two hundred seventy (270)-day period, and the failure to timely notify Landlord shall be a waiver of such termination right. If such notice is timely given, this Lease shall terminate as of the date Landlord receives such notice, and Rents shall be adjusted as of the date of such termination.

Section 21.3 - Demolition of Landlord's Building.

If the Shopping Center is so substantially damaged that it is necessary, in Landlord's reasonable judgment, to demolish all or a portion of the Shopping Center, including the Premises, for the purpose of reconstruction, then upon the date such demolition of the Premises commences, Rents shall be abated until the earlier to occur of (i) one hundred fifty (150) days after Landlord's restoration work has been substantially completed; or (ii) the date the Premises so restored has re-opened for business.

ARTICLE XXII
CONDEMNATION

Section 22.1 - Effect of Taking.

39

(a)     In the event that the whole or any part of the Premises shall be taken for public or quasi-public use or condemnation under eminent domain, this Lease shall terminate as to the part so taken on the date possession is yielded to the condemning authority.

(b)     In the event that any portion of the Shopping Center or Common Areas is taken, and such taking substantially impairs access to, or the usefulness of, the Premises for the purposes hereinbefore granted to Tenant, either party may terminate this Lease by written notice to the other party given within thirty (30) days prior to the actual physical taking.

(c)     For purposes of this Article XXII, a voluntary sale or conveyance in lieu of condemnation, but under threat of condemnation, shall be deemed an appropriation or taking under the power of eminent domain.

(d)     If this Lease is not terminated as above provided following any of such actual takings, then Landlord shall, at its expense, make all necessary repairs or alterations to the basic building and exterior work so as to constitute the remaining Premises a complete architectural unit and a proportionate allowance shall be made in Rents based on the proportion of the Premises remaining as compared to the original Premises, calculated from the date of such taking.

(e)     Landlord shall provide Tenant written notice of a pending taking of the Premises or a portion of the Shopping Center or Common Area which substantially impairs access to, or the usefulness of, the Premises following Landlord's receipt of notice of such from the condemning authority.

Section 22.2 - Compensation and Awards.

All compensation awarded for any taking of the fee and the leasehold, or any part thereof, shall belong to and be the property of Landlord. Tenant hereby assigns to Landlord all right, title and interest of Tenant in and to any award made for leasehold damages and/or diminution in the value of Tenant's leasehold estate. Tenant shall have the right to claim such compensation as may be separately awarded or allocated by reason of the cost or loss to which Tenant might be put in removing Tenant's merchandise, fixtures, leasehold improvements and equipment. Compensation as used in this Section 22.2 shall mean any award given to Landlord for such taking in excess of, and free and clear of, all prior claims of the holders of any mortgages or other security interests.

Section 22.3 - Condemnation or Breach of Lease.

Any such appropriation or condemnation proceedings shall not operate as, or be deemed an eviction of, Tenant or a breach of Landlord's covenant of quiet enjoyment.

Tenant hereby waives any statutory rights of termination which may arise by reason of any partial taking of the Premises under the power of eminent domain.

### ARTICLE XXIII
### DEFAULT

Section 23.1 - Default.

40

This Lease is made upon the condition that Tenant punctually and faithfully perform all of the covenants and agreements to be performed by Tenant as herein set forth and the occurrence of any of the following shall constitute a breach of this Lease by Tenant ("Default"):

(a)    Any item comprising Rents required to be paid by Tenant remaining in arrears and unpaid for ten (10) calendar days after receipt of written notice thereof from Landlord.

(b)    If Tenant or any related or affiliated entity shall be a party to any other lease(s) with Landlord for space(s) in the Shopping Center, and there shall exist a Default in either this Lease or in any of said other lease(s), such Default shall be deemed a Default under all such leases with Landlord, pursuant to which Landlord may take appropriate action hereunder.

(c)    Subject to Section 365 of the Bankruptcy Reform Act of 1978, as amended, if there is a filing of a petition proposing the adjudication of Tenant or any Guarantor(s) (if any) of Tenant's obligations hereunder as bankrupt and/or insolvent or if there is a reorganization of Tenant or Guarantor(s) (if any) or an arrangement by Tenant or Guarantor(s) (if any) with its creditors, whether pursuant to the Federal Bankruptcy Act or any similar federal or state/commonwealth proceeding, and such action is not dismissed within sixty (60) days after the date of filing.

Notwithstanding the foregoing, if there is a filing of a petition proposing the adjudication of Guarantor(s) (if any) as bankrupt and/or insolvent or if there is a reorganization of Guarantor(s) (if any) or an arrangement by Guarantor(s) (if any) with its creditors, then Tenant shall have the right to provide a replacement Guarantor(s) within thirty (30) days of such foregoing action, and as long as the replacement Guarantor(s) is/are reasonably satisfactory to Landlord in Landlord's sole discretion, upon the execution of a Guaranty in a form reasonably acceptable to Landlord by such Guarantor(s), then Tenant shall be deemed to have cured such Default.

(d)    Any sale of Tenant's interest in the Premises under an attachment, execution or similar legal process or pursuant to an unauthorized assignment of this Lease.

(e)    Any making by Tenant or Guarantor(s) (if any) of an assignment for the benefit of creditors.

Notwithstanding the foregoing, if Guarantor(s) (if any) make an assignment for the benefit of creditors, then Tenant shall have the right to provide a replacement Guarantor(s) within thirty (30) days of such foregoing action, and as long as the replacement Guarantor(s) is/are reasonably satisfactory to Landlord in Landlord's sole discretion, upon the execution of a Guaranty in a form reasonably acceptable to Landlord by such Guarantor(s), then Tenant shall be deemed to have cured such Default.

(f)    If Tenant shall vacate or abandon the Premises or shall fail to operate its business in accordance with the days and hours required herein, or fails to continuously occupy and conduct Tenant's business in the Premises.

(g)    Any failure by Tenant to remove any lien or notice of lien on account of an alleged debt of Tenant within the time period provided for in Section 15.1.

(h)    With the exception of items (a) through (g) above, a failure by Tenant to observe or perform any other covenant, term, condition, provision, rule or regulation of this Lease on the part of Tenant to be kept or performed and such failure shall continue for a period of thirty (30) calendar days or more after written notice thereof given to Tenant by Landlord (excepting any such failure that cannot reasonably be cured within said thirty (30) calendar day period, provided

41

that Tenant, within said thirty (30) calendar day period, has promptly commenced to proceed with diligence and in good faith to remedy such failure).

Section 23.2 - Remedies and Damages.

(a)     If a Default occurs, Landlord may, at its option, and in addition to any and all other rights and remedies provided Landlord in this Lease or at law or in equity (including, without limitation specific performance), immediately or at any time thereafter and without demand or notice (except as provided herein):

(i)     Apply all or part of the Security Deposit, if any, to cure such Default, without waiving the Default, and Tenant shall, on demand, restore the Security Deposit to its original amount; and/or

(ii)     Apply any overpayment of Rents to curing such Default, without waiving the Default, in lieu of refunding or crediting same to Tenant; and/or

(iii)     If the Default pertains to work or other obligations (other than the payment of Rents) to be performed by Tenant, without waiving such Default, enter upon the Premises and perform such work or other obligation, or cause such work or other obligation to be performed, for the account of Tenant, and Tenant shall, on demand, pay to Landlord the cost of performing such work or other obligation plus fifteen percent (15%) thereof for Landlord's administrative costs; and/or

(iv)     Terminate this Lease by written notice to Tenant. No re-entry or taking possession of the Premises by Landlord shall be construed as an election on its part to terminate this Lease unless a written notice of such intention is given to Tenant or unless the termination thereof is decreed by a court of competent jurisdiction.

(b)     Notwithstanding any termination of this Lease or termination of Tenant's rights to possession, whether by summary proceedings or otherwise, Tenant shall pay and be liable for (on the days originally fixed herein for payment thereof) all Rents as if this Lease had not been terminated, whether the Premises are relet or remain vacant in whole or in part. However, in the event the Premises are relet by Landlord, Tenant shall be entitled to a credit in the net sum of Rents received by Landlord in such reletting after deduction of all reasonable and actual expenses incurred in reletting the Premises and in collecting such Rents.

(c)     In the event of a reletting, Landlord may apply the rent therefrom first to the payment of Landlord's reasonable expenses, including, but not limited to, reasonable and actual attorneys' fees incurred, expenses attributable to reletting, repairs, brokerage fees, subdividing, renovation or alteration of the Premises and then to the payment of Rents and other sums due from Tenant hereunder, and Tenant shall remain liable for any deficiency thereof.

(d)     In computing damages or Rents due under this Lease, the value of Percentage Rent for any period subsequent to the termination of this Lease or the termination of Tenant's right of possession thereof shall be included and shall be an amount per year equal to one-third (1/3) of the total Percentage Rent chargeable to Tenant for the last three (3) full Lease Years immediately preceding such termination, and if less than three (3) full Lease Years shall have elapsed, such value shall be an amount per Lease Year equal to the average yearly Percentage Rent theretofore chargeable to Tenant.

42

(e)     In the event of a Default by Tenant, Tenant will be liable to Landlord for all court costs and reasonable and actual attorneys' fees incurred by Landlord in enforcing its rights and remedies under this Lease, including, without limitation, all costs and fees incurred in connection with obtaining possession of the Premises or in the enforcement of any covenant, condition or agreement herein contained, whether through legal proceedings or otherwise and whether or not any such legal proceedings are prosecuted to a final judgment. In the event of any Default by Tenant and recovery of possession by Landlord, Landlord may remove all persons and property from the Premises and such property may be stored in a public warehouse or elsewhere at the cost of, and for the account of Tenant, and disposed of in accordance with applicable law.

(f)     Landlord shall use commercially reasonable efforts to relet the Premises and mitigate damages; provided, however, that Landlord shall not be obligated to offer the Premises to a prospective tenant when other premises in the Shopping Center suitable for that prospective tenant's use are (or soon will be) available. Landlord shall not be obligated to lease the Premises to a substitute tenant for a rental less than the current fair market rental then prevailing for similar retail uses in comparable shopping centers in the same market area as the Shopping Center, nor shall Landlord be obligated to enter into a new lease under other terms and conditions that are unacceptable to Landlord under Landlord's then current leasing policies for comparable space in the Shopping Center. Further, Landlord shall not be obligated to enter into a lease with any proposed substitute tenant which does not have, in Landlord's reasonable opinion, sufficient financial resources or operating experience to operate the Premises in a first-class manner.

Section 23.3 - Remedy for Failure to Open or Operate.

Recognizing the difficulty or impossibility of determining Landlord's damages for loss of Percentage Rent anticipated from Tenant and/or occupants of the Shopping Center or for loss of value of the Shopping Center because of diminished salability, mortgagability, adverse publicity or appearance which may result from any one or more of the events enumerated in Section 23.1, Landlord and Tenant each covenants and agrees that in the event that Tenant (i) fails to take possession of, construct and thereafter open the Premises for business, fully fixtured, stocked and staffed on the Rent Commencement Date, or (ii) vacates or abandons the Premises, or (iii) ceases to operate Tenant's business within the Premises in full compliance with the use and business hours requirements set forth in Section 8.2, then, and in any of such events, Landlord shall have the right, at its option, to (a) collect not only the Rents reserved, but also an amount equal to three fourths (3/4ths) of the Rents reserved for the period(s) during which any of the aforementioned events shall continue, prorated on a daily basis for each and every day during such period, such additional amount to constitute liquidated damages for Tenant's breach, which the parties agree represents a reasonable estimate of Landlord's damages sustained by reason of Tenant's breach; and/or (b) treat  such action or omission by Tenant as a Default under this Lease as hereinabove described and to exercise any remedy therefor, whether reserved in this Lease or available at law or in equity.

Section 23.4 - Repeated Default.

(a)     Notwithstanding anything to the contrary set forth in this Lease, if Tenant shall be in Default in the timely payment of any Rents due Landlord from Tenant, or the payment of any other charges due Landlord from Tenant under the terms of this Lease, or in the timely reporting of Gross Revenue as required by Section 11.2, and any such Default shall be repeated two (2) times in any period of twelve (12) consecutive months, then, notwithstanding that such Default shall have been cured within the period after notice as provided in this Lease, any further similar Default within said twelve (12) month period shall be deemed to be a "Repeated Default".

43

(b)    In the event of a Repeated Default, Landlord may, in addition to any other rights and remedies provided Landlord in this Lease or at law or in equity, and without notice to Tenant and without affording Tenant an opportunity to cure such Repeated Default, terminate this Lease forthwith.

Section 23.5 - Waiver of Rights of Redemption.

Tenant hereby expressly waives any and all rights of redemption granted by or under any present or future Applicable Laws in the event that Tenant is in the process of being evicted or dispossessed for any cause, or in the event Landlord obtains possession of the Premises by reason of a violation by Tenant of any of the covenants or conditions of this Lease or otherwise.

ARTICLE XXIV
COMPETITION

Section 24.1 - Restriction on Tenant.

Tenant agrees that for as long as this Lease shall remain in effect, Tenant, or if Tenant is a corporation, partnership or limited liability company, its partners, officers, managers, members, directors, shareholders or any affiliates, shall not directly or indirectly operate, manage, or have any interest in any business which is similar or in competition with the Permitted Use, or operating under the same Trade Name ("Competing Store") within a radius of three (3) miles of the perimeter of the Shopping Center ("Restricted Area").

Section 24.2 - Imposition of Damages.

In the event that Tenant shall violate the provisions of Section 24.1, Landlord may, at its option, and without limiting Landlord's remedies, effective as of the date such Competing Store opens for business within the Restricted Area: (i) include seventy-five percent (75%) of the gross sales of such Competing Store in the Gross Revenue generated from the Premises for purposes of computing any Percentage Rent due hereunder; or (ii) increase the Fixed Minimum Rent to the average of the annual "effective rent" (i.e., the aggregate of Fixed Minimum and Percentage Rent) payable by Tenant to Landlord during the immediately preceding two (2) Lease Years; or (iii) increase Tenant's Fixed Minimum Rent then in effect, and any future increases thereto, by fifty percent (50%).

Section 24.3 – Exclusive Use.

(a)    Subject to the terms and conditions of this Section 24.3, Landlord agrees not to lease any space within the area of the retail portion of the Shopping Center hatched on **Exhibit B-1** attached hereto and made a part hereof (the "Exclusive Area") to a tenant whose Primary Business (as hereinafter defined) is the operation of a Competing Business (as hereinafter defined) (the "Exclusive Use"). As used herein, "Primary Business" shall mean twenty-five percent (25%) or more of the gross leasable square footage of such tenant is permanently devoted to the Competing Business. As used herein, "Competing Business" shall mean the operation of a retail entertainment venue featuring location and experience based, free-roam, motion tracking virtual or augmented reality (VR/AR) experiences or similar technology allowing for similar level VR/AR experiences and that allows two (2) or more participants to enter into, explore, and interact with each other within a virtual or augmented reality environment. Examples of a Competing Business include, but are not limited to: The Void; Dreamscape; Immersive; Nomadic; Zero Latency and VRStudios.

44

(b)     The Exclusive Use shall not apply to: (i) any existing Shopping Center tenant (together with their successors, assigns and replacements) whose lease, as of the Effective Date, does not prohibit the subject premises to be used in violation of the Exclusive Use (provided, that if such tenant, under such tenant's lease proposes a change to its permitted use which requires Landlord's consent thereto, Landlord agrees not to consent to, authorize or otherwise permit any such change in use which would cause such tenant to operate in violation of the Exclusive Use); (ii) any Major; or (iii) use of virtual or augmented reality (1) as an arcade or gaming center with stationary games which include a virtual reality component, or (2) by a retailer to enhance its customers shopping experience.

(c)     Notwithstanding anything to the contrary contained herein, Landlord shall not be in violation of the Exclusive Use if any tenant, subtenant, assignee, licensee or concessionaire is operating in its premises in default of its permitted use as set forth in such tenant's occupancy agreement, and Tenant shall not have the right to pursue the remedies set forth in this Section 24.3, so long as Landlord is diligently attempting to enjoin such tenant from violating the Exclusive Use.

(d)     The Exclusive Use shall automatically become null and void and of no further force and effect if (i) Tenant Defaults under any provisions, covenants or conditions of this Lease; (ii) Tenant ceases to continuously operate for business in the Premises in accordance with the terms of this Lease; or (iii) Tenant ceases to use the Premises for the operation of an "escape room" virtual reality experience center.

(e)     The Exclusive Use shall automatically expire if an order or decision by any court having jurisdiction declares this Exclusive Use clause void (including, without limitation, any decision by a court of bankruptcy).

(f)     In the event that any prospective tenant or any governmental authority challenges the validity of this Exclusive Use clause, then Tenant shall upon written notice thereof from Landlord either forfeit and waive its Exclusive Use right or defend the challenge with counsel of its own selection, whereupon Tenant agrees to indemnify, defend and hold Landlord harmless from and against any claims, expenses, damages, fines and liability arising from the granting to Tenant of this Exclusive Use clause.  This indemnity shall survive the termination of this Lease.

## ARTICLE XXV
## NOTICES

Section 25.1 - Notices to Tenant and Landlord.

Any notice or consent required to be given to, by, or on behalf of either party (including, without limitation, Landlord's counsel, agent, or third party manager), shall be in writing and shall be given by mailing such notice or consent by registered or certified mail, return receipt requested, or by a nationally recognized overnight courier which provides written evidence of delivery, addressed to Landlord at Landlord's Notice Address, and to Tenant at Tenant's Notice Address, and either party may, by written notice similarly given, designate a substitute address at any time hereafter.  Any such written notice shall be deemed given when mailed as in this Section 25.1 provided, or delivered personally to the parties hereto or to their authorized agents and/or officers. Rejection, refusal, failure to accept, or the inability to deliver any written notice sent hereunder shall be deemed to be receipt of such notice, demand or request.

Section 25.2 - Notices to Mortgagee.

45

Tenant shall give written notice to Landlord's mortgagee, at Landlord's Mortgagee's Notice Address, or at such other address as Landlord may, from time to time, designate in writing, of any default by Landlord hereunder which could give rise to Tenant's termination of this Lease or any expenditure of money on behalf of Landlord.  Landlord's mortgagee shall also be given an appropriate time to cure such default, including, but not limited to, the opportunity to obtain possession of Landlord's interest, if necessary, to cure the default.  Landlord shall notify Tenant of any change in the mortgagee for the Shopping Center.

ARTICLE XXVI
MISCELLANEOUS

Section 26.1 - Accord and Satisfaction.

No payment by Tenant or receipt by Landlord of a lesser amount than the Rents herein stipulated shall be deemed to be other than on account of the earliest stipulated Rents, nor shall any endorsement or statement on any check or letter accompanying the payment of any Rents be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such Rents or pursue any other remedy provided for in this Lease or available at law or in equity.  Landlord may, at its option and its sole discretion, apply any payments received from Tenant to any Rent then due and payable.  If Landlord shall not make any specific application of a payment received from Tenant, then any payment received from Tenant shall be applied first to the other charge, then to Rent which has been overdue for the longest period of time.  No designation of any payment by Tenant for application to a specific portion of Tenant's financial obligations hereunder shall be binding upon Landlord.  Any sums received by Landlord after termination of this Lease shall not constitute rent but shall be received only as reimbursement for use and occupancy of the Premises.

Section 26.2 - Complete Agreement.

The parties hereto acknowledge that all of the terms and covenants contained herein were reviewed by both parties and/or their legal counsel, and all negotiations, consideration, representations, inducement and understandings between the parties are incorporated herein and may be modified or altered only by agreement, in writing, between the parties.  This Lease contains the entire agreement between the parties hereto, and no agent, representative, employee or officer of Landlord has authority to make, or has made, any statement, agreement or representation, either oral or written, in connection herewith, modifying, adding or changing the terms and conditions herein set forth.  No present or past dealings or customs between the parties shall be permitted to contradict or modify the terms hereof.  Tenant represents, warrants and covenants that it (a) is upon the Effective Date, and shall be throughout the Term of Lease, authorized to do business and in good standing in the state in which the Premises are located, and (b) has full authority to enter into this Lease, which has been duly authorized by all necessary actions.  Tenant, if a partnership or corporation, shall furnish to Landlord, upon request, evidence of authority for entering into this Lease.

Section 26.3 - Consents.

Neither Landlord nor Tenant shall unreasonably withhold approval or consent when required from either party under the terms of this Lease (except where otherwise stated herein); provided, however, that Landlord shall not be deemed to have unreasonably withheld such approval or consent if its mortgagee shall refuse to permit Landlord to grant such consent. Landlord and Tenant agree that Tenant shall have the burden of proving that Landlord's consent was withheld unreasonably.

46

Section 26.4 - <u>Brokerage</u>.

Tenant acknowledges that SRS Real Estate Partners ("<u>Broker</u>") may be entitled to a fee for broker's services rendered in bringing together the parties to this Lease (the "<u>Commission</u>"). The Commission shall be paid by Landlord pursuant to a separate agreement. Tenant warrants that it has had no dealings with any broker or agent in connection with this Lease, or in the event Tenant has had any such dealings, Tenant covenants and agrees to pay, hold harmless and indemnify Landlord from and against any and all costs, expenses or liability for any compensation, commissions or charges claimed by any broker or agent with respect to this Lease or negotiation hereof (including, without limitation, the cost of legal fees in connection therewith).

Section 26.5 - <u>Effective Date of Lease</u>.

Submission of this Lease by Landlord for examination or execution by Tenant does not constitute a reservation of, nor option for, Lease and this instrument shall not become effective as a lease or otherwise until execution by, and delivery to, both Landlord and Tenant. This Lease shall only become effective and binding upon the parties in establishing the relationship of Landlord and Tenant as of the date first written above, but not earlier than the date Landlord executes this Lease. The Effective Date shall be filled in on the date the last of Landlord or Tenant executes same.

Section 26.6 - <u>Estoppel Certificates</u>.

Tenant agrees at any time and from time to time, within fifteen (15) days after receipt of written request from Landlord, to execute, acknowledge and deliver to Landlord a written statement certifying that this Lease is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications), the dates to which Rents have been paid pursuant to this Lease, and such other certification concerning this Lease as may be reasonably required by Landlord or Landlord's mortgagee. Tenant further agrees that said statement may be relied upon by any prospective purchaser of the fee or mortgage or assignee of any mortgage on the fee of the Premises.

Section 26.7 - <u>Force Majeure</u>.

Landlord and/or Tenant shall be excused for the period of delay in the performance of any of their respective obligations hereunder, except their obligation to pay any sums of money due under the terms of this Lease, and shall not be considered in Default of this Lease when prevented from so performing by cause(s) beyond Landlord's or Tenant's control, including, but not limited to, civil commotion, war, fire or other casualty, governmental regulations, statutes, ordinances, restrictions or decrees, or through acts of God.

Section 26.8 - <u>Interpretation</u>.

The laws of state/commonwealth in which the Shopping Center is located shall govern the validity, performance and enforcement of this Lease. If any provision of this Lease shall be adjudged by any court of competent jurisdiction to be invalid, such judgment shall not be deemed to affect or impair any other provisions hereunder. It is understood and agreed that this Lease is to be deemed a "lease of real property in a Shopping Center" as such term is used in the Bankruptcy Act, and that neither Tenant's interest in this Lease, nor in any estate created hereby shall pass to any trustee or receiver or assignee for the benefit of creditors or otherwise except as may be specifically provided therein. Nothing contained in this Section shall be deemed in any

47

manner to limit Landlord's rights and remedies under the Bankruptcy Act, as presently existing or as may be hereafter amended.

Section 26.9 - Memorandum of Lease.

This Lease shall not be recorded, but either party may record a Memorandum of Lease describing the Premises herein demised, the Term of Lease and referring to this Lease. The party requesting that the Memorandum of Lease be recorded shall prepare and pay all costs of preparation and recording of the Memorandum of Lease and the other party agrees to execute such instruments as may be reasonably required for such recording. Tenant shall execute such documents as Landlord may require, in recordable form, upon the expiration or earlier termination of the Term of Lease in order to remove the Memorandum of Lease from record.

Section 26.10 - Quiet Enjoyment.

Subject to the terms and conditions of this Lease and to any Encumbrances to which this Lease is subordinate pursuant to Section 18.1, Landlord hereby covenants and agrees that if Tenant shall faithfully perform all the covenants and agreements herein stipulated to be performed on Tenant's part, Tenant shall, at all times during the continuance hereof, have the peaceful and quiet enjoyment and possession of the Premises without any manner of hindrance from Landlord or any person(s) lawfully claiming the Premises, save and except in the event of the taking of the Premises by public or quasi-public authority as hereinbefore provided.

Section 26.11 - Rent Demand.

Every demand for Rents due wherever and whenever made shall have the same effect as if made at the time it falls due and at the place of payment, and after the service of any notice or commencement of any suit or final judgment therein, Landlord may receive and collect any Rents due, and such collection or receipt shall not operate as a waiver of, nor affect, such notice, suit or judgment.

Section 26.12 - Section and Title Headings.

The section and title headings contained herein are for convenience purposes only and do not define, limit, construe or amplify the contents of any such sections.

Section 26.13 - Successors and Assigns.

The conditions, covenants and agreements contained in this Lease shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and permitted assigns.

Section 26.14 - Waiver.

(a)     Landlord and Tenant shall each have the right at all times to enforce the covenants, conditions and legal rights and remedies of this Lease in strict accordance with the terms hereof, notwithstanding any conduct or custom(s) on the part of Landlord or Tenant in refraining from so doing at any time(s). No failure by either party hereto to insist upon the strict performance of any term or condition of this Lease, no failure by either party hereto to exercise any right or remedy available, legal or equitable, for a breach thereof, and no acceptance by Landlord of full or partial Rents during the continuance of any such breach shall constitute a waiver by such party of any such breach, term, condition or right.

48

064

(b)    No term or condition of this Lease required to be performed by Landlord or Tenant, and no breach thereof, shall be waived, altered or modified except by written instrument executed by the waiving party.

(c)    A waiver by Landlord with respect to any tenant of the Shopping Center shall not constitute a waiver in favor of any other tenant, nor shall the waiver of any breach or condition be claimed if pleaded to excuse a future breach of the same condition or covenant or any other condition, covenant, provision, rule or regulation of this Lease.

Section 26.15 - Exculpation.

If Landlord shall fail to perform any covenant, term or condition of this Lease upon Landlord's part to be performed, and as a consequence of such failure, Tenant shall recover a money judgment against Landlord, such judgment shall be satisfied only against the right, title and interest of Landlord in the Shopping Center and out of rents or other income from the Shopping Center received by Landlord. Neither Landlord nor any partners, beneficiaries, officers, directors, members, joint venturers, shareholders or affiliated entities of Landlord shall be personally liable for any deficiency.

Section 26.16 - Transfer of Landlord's Interest.

Landlord shall be liable under this Lease only while owner of the Shopping Center.  If Landlord should sell or otherwise transfer Landlord's interest in the Shopping Center, and if such purchaser or transferee assumes Landlord's obligations hereunder, then such purchaser or transferee shall be responsible for all covenants and undertakings thereafter accruing to Landlord. Tenant agrees that after such sale or transfer of Landlord's interest, Landlord shall have no liability to Tenant under this Lease or any modification(s), amendment(s), extension(s) or renewal(s) thereof, except for such liabilities which might have accrued prior to the date of such sale or transfer of Landlord's interest to such purchaser or transferee (including, without limitation, If the Security Deposit or balance thereof has not been turned over to Landlord's successor or transferee, as set forth in Section 11.6(b)).

Section 26.17 - Litigation; Attorneys' Fees.

(a)    Any claim, demand, right or defense of any kind by Tenant or Landlord, as the case may be, which is based upon, or arises in connection with, Tenant's obligation to pay Rent shall be barred unless Tenant or Landlord, as the case may be, provides notice to the other party within twenty-four (24) months after the later of (i) the date of such occurrence of the billing, or (ii) the date such payment is due pursuant to the terms of this Lease.

(b)    To the extent permitted by law, Landlord and Tenant each hereby waives all right to trial by jury in any claim, action, proceeding or counterclaim by either Landlord or Tenant against the other with respect to any matter arising out of, or in any way connected with, this Lease, the relationship of Landlord and Tenant, or Tenant's use or occupancy of the Premises.

(c)    If either party hereto be made, or becomes a party to, any litigation commenced by or against the other party involving the enforcement of: (i) any Applicable Laws against such other party; or (ii) any rights or remedies of such party hereunder, then in either of such events, the prevailing party in any such litigation, or the party becoming involved in such litigation because of a claim against such other party, as the case may be, shall receive from the other party all costs and reasonable and actual attorneys' fees incurred by such party in said litigation.

49

(d)     Any litigation commenced by Landlord or Tenant against the other with respect to any matter arising out of, or in any way connected with, this Lease, the relationship of Landlord and Tenant hereunder, or Tenant's use and occupancy of the Premises, shall be brought only in the courts of the state/commonwealth in which the Premises is located and the parties hereby consent to the jurisdiction of said courts.

(e)     Tenant shall pay any reasonable costs, expenses and actual attorneys' fees incurred by Landlord for any amendment, change or addition to this Lease made at the request of or to accommodate Tenant. In the event that Tenant breaches any provision of this Lease for which Landlord consults with or retains an attorney, then all costs and expenses, including reasonable attorneys' fees and expert fees, incurred by Landlord shall be paid by Tenant, regardless of whether any action or proceeding is instituted based on such breach, as Rent and shall be due from Tenant immediately upon delivery by Landlord to Tenant of an invoice for said expenses.

Section 26.18 - Protection of REIT Status.

In the event that Landlord determines that any of the financial obligations of Tenant to Landlord as set forth in this Lease might (a) fail to qualify as "rents from real property" within the meaning of Section 856(d) of the Internal Revenue Code of 1986, as amended (the "Code"), or (b) otherwise jeopardize the status of any of Landlord's affiliates as a "real estate investment trust" ("REIT") within the meaning of Section 856 of the Code, then, at Landlord's option, Landlord may, in its sole discretion, assign any of its rights and obligations under this Lease to a designee chosen by Landlord for such purpose (which, in each case, shall be an affiliate of Landlord), or cause one or more such designees (which, in each case, shall be an affiliate of Landlord) to perform such activities to the extent required to maintain such status as a REIT. No election, assignment or other action by Landlord hereunder will relieve Landlord of or from its liability for obligations to Tenant under this Lease following any such assignment.

Section 26.19 – Patriot Act.

Tenant hereby represents, covenants and warrants to Landlord that: (i) Tenant (which, for the purpose of this certification, includes its partners, members, principal shareholders, except for those who are members of the public who hold Tenant's stock), to the best of its knowledge, is not in violation of any laws, executive orders or regulations relating to terrorism or money laundering, including Executive Order No. 13224 – Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism, effective September 24, 2001 (the "Executive Order"), and/or the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) of 2001 (Public Law 107 56) (the "Patriot Act"), enacted October 26, 2001, as amended, and Tenant has not been designated as a "Specially Designated National and Blocked Person" or other banned or blocked person, entity, nation, or transaction pursuant to the Executive Order, the Patriot Act, or any other law, order, rule, or regulation; (ii) Tenant is currently in compliance with and will at all times during the Term of Lease remain in compliance with the Executive Order, the Patriot Act, and regulations of the Office of Foreign Assets Control of the United States Department of the Treasury, and any statute, executive order and other governmental action relating thereto; and (iii) Tenant is not engaged in this transaction, directly or indirectly, on behalf of, or instigating or facilitating this transaction, directly or indirectly, on behalf of, any such person, group, entity, or nation.

Section 26.20 – Counterparts.

50

This Lease may be executed in multiple counterparts each of which when taken together shall constitute a binding agreement. This Lease may be executed and delivered by electronic copy (such as .pdf), which such electronic copy or facsimile signatures and delivery shall be valid and binding the same as if original documents were delivered. Each party executing and delivering electronic copies agrees to deliver originals to the other party promptly upon request.

Section 26.21 – Perpetuities Protection.

Notwithstanding anything in this Lease to the contrary, if the Rent Commencement Date shall not have occurred by the date which is twenty-one (21) years after the date which is one (1) day prior to the date hereof, this Lease shall automatically terminate and expire, although nothing herein contained shall or shall be deemed to be a release of Landlord or Tenant from any liability under this Lease for the period prior to such termination.

Section 26.22 – YIDA Reporting Requirements.

Tenant agrees to report to Landlord on an annual basis, within thirty (30) days of Landlord's request therefor in each instance, such job creation and related information (as it relates to Tenant's employees at the Premises) as may be requested from time to time by City of Yonkers Industrial Development Agency ("YIDA") of Landlord with regard to employees at the Shopping Center.

Section 26.23 – Covenant Not to Oppose Whole Foods Wine License Application.

Tenant covenants that it will not oppose any application to the New York State Liquor Authority Division of Alcoholic Beverage Control for the sale of wine for on- or off-premises consumption by the tenant doing business as Whole Foods (or any successor trade name) in the Shopping Center.

(signatures on following page)

51

IN WITNESS WHEREOF, the parties hereto have executed this Lease as of the day and year first written hereinabove.

Signed in the presence of:

**LANDLORD:**

Name: _Nanette Blount_

**YONKERS ASSOCIATES, LLC,**
a New York limited liability company

Name: _Sondra Mendenhall_

By: _Stacey Paluf_
Name: _Vice President_
Title: _____

STATE OF OHIO      )
                   ) SS:
COUNTY OF CUYAHOGA )

BEFORE ME, the undersigned Notary Public in and for said County and State, personally appeared the above named YONKERS ASSOCIATES, LLC, a New York limited liability company, by _Stacey Paluf_, its _Vice President_, who acknowledged that he/she did sign the foregoing instrument and that the same is his/her free act and deed and the free act and deed of said limited liability company.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal this _15_ day of March, 2019.

_____
Notary Public

(signatures continued on following page)

JUNE T. TORTORICI, Notary Public
STATE OF OHIO
My Commission Expires _____
(Recorded in Cuyahoga County)

52

068

Signed in the presence of:

Name: _Randir  Lathi_

Name: _Zanae  Nisbet_

STATE OF _California_ )
                                     ) SS:
COUNTY OF _Alameda_ )

**TENANT:**

**SANDBOX VR RIDGE HILL, LLC,**
a Delaware limited liability company

By: _____

Name: Joseph Freschi
Title:  Manager

BEFORE ME, the undersigned Notary Public in and for said County and State, personally appeared the above named SANDBOX VR RIDGE HILL, LLC, a Delaware limited liability company, by Joseph Freschi, its Manager, who acknowledged that he did sign the foregoing instrument and that the same is his free act and deed and the free act and deed of said limited liability company.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal this _7th_ day of March, 2019.

Notary Public

PATRICIA L. MANZI
COMM. # 2219209
NOTARY PUBLIC • CALIFORNIA
ALAMEDA COUNTY
COMM. EXP. OCTOBER 21, 2021

53

069

## GUARANTY

FOR VALUE RECEIVED and in consideration for and as an inducement to Landlord for entering into the Lease dated March ⟨15th⟩ 2019 (the "Lease"), by and between YONKERS ASSOCIATES, LLC, a New York limited liability company ("Landlord") and SANDBOX VR RIDGE HILL, LLC, a Delaware limited liability company ("Tenant"), to which this Guaranty is attached, the undersigned **GLOSTATION USA, INC.**, a Delaware corporation ("Guarantor"), hereby guarantees to Landlord, its successors and assigns, the full performance and observance of all the covenants, conditions, and agreements therein provided to be performed and observed by Tenant, its successors and assigns, and expressly agree that the validity of this agreement and the obligations of Guarantor hereunder shall in no way be terminated, affected, or impaired by reason of the assertion by Landlord against Tenant of any of the rights or remedies reserved to Landlord pursuant to the provisions of the within Lease, or by reason of the waiver by Landlord of, or the failure of Landlord to enforce any of the terms, covenants, and conditions of said Lease, or the granting of any indulgence or extension of time to Tenant, all of which may be given or done without notice to Guarantor.  Guarantor waives demand and notice of default in the payment of rent, additional rent, or any other amounts contained or reserved in said Lease, or notice of a breach of non-performance of any of the covenants, conditions, or agreements contained in said Lease.  Guarantor further covenants and agrees that this agreement and Guaranty is absolute and unconditional and shall remain and continue in full force and effect as to any amendment, modification, renewal or extension of the within Lease, to all of which the undersigned hereby consents in advance.

Guarantor further agrees that its liability under this agreement and Guaranty shall be primary, and that in any right of action which shall accrue to Landlord under the within Lease, Landlord may, at its option, proceed against the undersigned without having given any demand or notice or commenced any action, or having obtained any judgment against Tenant.

Except as otherwise expressly set forth in the Lease, no assignment or any other transfer of Tenant's interest in the within Lease shall operate to extinguish or diminish the liability of the undersigned under this agreement and Guaranty.  No bankruptcy, insolvency, or any other debtors relief proceedings shall operate to release or discharge this Guaranty or the obligations of Guarantor hereunder.

(signature on following page)

Signed in the presence of:

Name: _Pandit Lathi_

Name _Zianae Nisbet_

STATE OF _California_ )
                          ) SS:
COUNTY OF _Alameda_ )

**TENANT:**

**GLOSTATION USA, INC.,**
a Delaware corporation

By: _____
Name: _JOSEPH FRESCHI_
Title: _EVP & General Counsel_

BEFORE ME, the undersigned Notary Public in and for said County and State, personally appeared the above named GLOSTATION USA, INC., a Delaware corporation, by _Joseph Freschi_, its _Manager_, who acknowledged that he/she did sign the foregoing instrument and that the same is his/her free act and deed and the free act and deed of said corporation.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal this _14th_ day of March, 2019.

_____
Notary Public

PATRICIA L. MANZI
COMM. # 2219209
NOTARY PUBLIC • CALIFORNIA
ALAMEDA COUNTY
COMM. EXP. OCTOBER 21, 2021

## EXHIBIT A
## SITE PLAN OF THE SHOPPING CENTER

*[DISCLAIMER: The purpose of this Exhibit A is to show an overview of the retail buildings, land and Common Areas comprising the shopping center development only. All areas and dimensions shown are approximate. Plan may not be to scale. Not to be deemed a representation or warranty of any kind, including without limitation as to the location or size of any areas shown; whether any tenants named will actually be tenants of the Shopping Center or open for business; or whether the Premises, the Shopping Center, or any portion thereof, or any Common Areas, common facilities, roadways, access points, or anything else noted on plan will be constructed at all or as shown.]*



RIDGE HILL

YONKERS, NEW YORK

## EXHIBIT B
## LEASE PLAN OF THE SHOPPING CENTER

*[DISCLAIMER: The purpose of this Exhibit B is to identify the location of the Premises only. All areas and dimensions shown are approximate. Plan may not be to scale. Not to be deemed a representation or warranty of any kind, including without limitation as to the location or size of any areas shown; whether any tenants named will actually be tenants of the Shopping Center or open for business; or whether the Premises, the Shopping Center, or any portion thereof, or any Common Areas, common facilities, roadways, access points, or anything else noted on plan will be constructed at all or as shown.]*



**WESTCHESTER'S RIDGE HILL**
WESTCHESTER COUNTY, NEW YORK

073

## EXHIBIT B-1
## EXCLUSIVE AREA

*[DISCLAIMER: The purpose of this Exhibit B-1 is to identify the location of the Exclusive Area only. All areas and dimensions shown are approximate. Plan may not be to scale. Not to be deemed a representation or warranty of any kind, including without limitation as to the location or size of any areas shown; whether any tenants named will actually be tenants of the Shopping Center or open for business; or whether the Premises, the Shopping Center, or any portion thereof, or any Common Areas, common facilities, roadways, access points, or anything else noted on plan will be constructed at all or as shown.]*



WESTCHESTER'S RIDGE HILL
WESTCHESTER COUNTY, NEW YORK

## EXHIBIT B-2
## RELOCATION AREA

*[DISCLAIMER: The purpose of this Exhibit B-2 is to identify the location of the Relocation Area only. All areas and dimensions shown are approximate. Plan may not be to scale. Not to be deemed a representation or warranty of any kind, including without limitation as to the location or size of any areas shown; whether any tenants named will actually be tenants of the Shopping Center or open for business; or whether the Premises, the Shopping Center, or any portion thereof, or any Common Areas, common facilities, roadways, access points, or anything else noted on plan will be constructed at all or as shown.]*



WESTCHESTER'S RIDGE HILL
WESTCHESTER COUNTY, NEW YORK

<u>EXHIBIT C</u>
<u>TENANT HANDBOOK</u>

[TO BE FORWARDED UNDER SEPARATE COVER]

## EXHIBIT C-1
## TENANT'S WORK



**Westchester's Ridge Hill**
**Lease Requirements**
**Tenant Coordination**

**Sandbox VR – TLP#1030**
**March 4, 2019**



This space requires complete construction from a shell space, which would include the following:

1. New Storefront and Signage in accordance with Tenant Handbook and tenant's latest prototype.
2. A complete interior remodel to include all new ceiling, lighting, wall finishes, floor finishes and fixtures in accordance with Tenant Handbook and Tenant's latest prototype.
3. All work previously considered Landlord work:
   A. HVAC system
      a) Split system unit(s) which includes condenser(s) on the roof, sized at 250 SF per ton (29 tons total).
      b) Refridgerant piping to roof.
      c) Electrical conduit(s) with pullstring to roof unit(s).
      d) Outside air grills.
      e) Internal distribution (ducts, diffusers, etc.).
      f) Electrical connections to units..
   B. Rear Egress
      a) Stairs to existing stairwell (required due to elevation change).
      b) ADA alcove next to stairs.
      c) Fire rated door to the stairwell.
4. All plumbing, electrical and HVAC must comply with Tenant Handbook and local jurisdictional codes.

Approved: Retail Tenant Coordinator      Date: 03-04-19

Approved: Regional Director TC      Date: 03-04-19

600 Superior Avenue East – Suite 1500 – Cleveland, OH 44114

EXHIBIT C-2
REQUIRED TENANT CONTRACTOR'S DEPOSIT AND FEES

**Required Tenant Contractor's Deposit and Fees**

| | |
|---|---|
| **Refundable Security Deposit**<br>(Provide Refundable Security Deposit on Separate Check) | $5,000.00 |
| **Dumpster Fee** (one time charge) | $1.00/sf |
| **Temporary Utility Fee** (excludes temporary electrical and heat)<br>(Charge for the construction temporary toilets/water) | $.30/sf |
| **Water Sub-meter System**<br>(Provided by Landlord at the Tenant expense) | ¾" - $ 410.00<br>1" - $460.00<br>1½" - $665.00<br>2" - $785.00<br>3" - $1,655.00 |
| | $750.00 |
| **Fire Alarm Devices**<br>(Landlord provided tamper switch) | |
| **Grease Interceptor and Waste Line Installation Fee (if applicable)**<br>(Pro rata portion of the pre-installed grease interceptor and associated greases waste lines.) | Tenant Pro Rated Share |
| **Sprinkler Grid (if applicable)**<br>(Pro rata portion of the pre-installed sprinkler grid.) | Tenant space under 5000 sf = $2.30/sf<br>Tenant space over 5001 sf = $1.75/sf |
| **Barricade (if applicable)** | $8.00/sf of barricade opening |

EXHIBIT D
RULES AND REGULATIONS

1.      Tenant shall maintain the Premises and sidewalks adjoining thereto, if any, free and clear of all rubbish, garbage and trash generated from the Premises, at its sole cost and expense.  Tenant shall place all of its trash in containers or compactors in the locations designated by Landlord, and shall contract directly with a hauling company designated by Landlord for the removal of trash, or as Landlord otherwise reasonably directs, at Tenant's sole cost and expense.  Trash placed in a designated location within the loading dock for pick-up must be in closed water tight containers or, in Landlord's discretion, placed in tied-off and secure plastic trash bags.

2.      All pick-up and delivery activities shall be made in a manner that does not inhibit the flow of automobile and pedestrian traffic, in a manner consistent with local law and in the designated area in accordance with the Lease.

3.      Tenant shall not leave merchandise or equipment (i.e. trash receptacles, pallet jacks, dollies, etc.) unattended in any common area (loading areas, back hallways, etc.) of the Premises.

4.      Tractor trailers or other vehicles may not be stored or parked in any area that is not designated by Landlord in writing for the exclusive use of Tenant.

5.      Tenant shall not permit or suffer the use of any advertising medium which can be heard or experienced outside of the Premises, including, without limiting the generality of the foregoing, flashing lights, searchlights, loudspeakers, phonographs, radios or television.

6.      Tenant shall not, in or on any part of the Common Areas:
    i.      Vend, peddle or solicit orders for sale or distribution of any merchandise, device, service, periodical, book, pamphlet or other matter whatsoever;
    ii.     Exhibit any sign, placard, banner, notice or other written material, except for activities as approved in writing by landlord and only in such areas as approved.;
    iii.    Distribute any circular, booklet, handbill, placard or other material, except for activities as approved in writing by Landlord and only in such areas as approved;
    iv.     Solicit membership in any organization, group or association or contribution for any purpose;
    v.      Use Common Areas for any purpose when none of the other retail establishments within the Shopping Center is open for business or employment, except for activities as approved in writing by Landlord and only in such areas as approved;
    vi.     Create a nuisance;
    vii.    Deface, damage or demolish any sign, light standard or fixture, landscaping materials or other improvement within the Shopping Center, or the property of customers, business invitees or employees situated within the Shopping Center.

**Signage and Printed Materials**

7.      Tenant shall use reasonable efforts to have construction repairs to the exterior areas of the Premises done prior to or after Shopping Center Hours (sign repairs, window glazing, etc.) Set-up and staging procedures for such work shall be subject to Landlord's prior written approval, not to be unreasonably withheld, on a case by case basis.

**Roof/Roof Access**

8. Tenant and/or its contractor must utilize the rooftop protective pads as the path of travel to all parts of the roof.
9. Tenant and/or its contractor must remove all trash and debris (screws, wire, sheet metal, etc.) from the work area upon completion of their work.

**Deliveries**
10. Delivery vehicles which exceed the height of the loading dock will be directed away and rescheduled until they conform to access specifications. Delivery vehicles exceeding 55 feet in length will not be granted access to the loading dock. Landlord reserves the right at any time to prohibit deliveries from tractor trailers if, in Landlord's judgment, same would disrupt the flow of pedestrian or vehicular traffic in the Shopping Center.
11. Deliveries shall only be permitted before noon on Mondays through Fridays, and at no other times.
12. All deliveries are to be made to designated service or receiving areas and only by way of designated service routes and drives.
13. Tractor trailers which must be unhooked or parked must use steel plates under dolly wheels to prevent damage to the asphalt paving surface. In addition, wheel blocking must be available for use. Tractor trailers are to be removed from the loading areas after unloading.
14. Carts, dollies or any wheeled device used for the purpose of delivering supplies or merchandise must be equipped with hard rubber or pneumatic wheels when traveling over tiled (ceramic or VCT, etc.) interior common areas. Such devices with metal wheels will not be permitted in the Shopping Center.

**General Provisions**
15. Tenant shall not use, permit or suffer the use of any portion of the Premises as living, sleeping or lodging quarters.
16. No load will be placed on any floor of the Premises which exceeds the load per square foot which such floor area was designed to carry.
17. All mechanical equipment and machinery will be kept free of noise and vibrations which may be transmitted to any part of the walls or building of which the Premises forms a part or beyond the confines of the Premises.
18. No live animals will be kept on or within the Premises except if otherwise expressly provided under the Permitted Use.
19. Tenant shall not install, suffer or permit to be installed or place any cover, fascia, partition, decoration, alteration or improvement or the like over, upon or under the sprinkler heads within the Premises, the same to remain exposed at all times.
20. Except to the extent that a rig would be required, all windows shall be kept washed and clean by Tenant at all times to Landlord's reasonable satisfaction. Landlord shall be responsible for washing and cleaning those windows requiring a rig for washing and cleaning, and the cost of same shall be payable by Tenant to Landlord as Rent, unless Landlord elects in writing to Tenant for Tenant to perform such washing and cleaning.
21. Tenant shall keep the Premises at a temperature sufficiently high to prevent freezing of water in pipes and fixtures.

## EXHIBIT E
## TENANT'S FIXED SHARE OF TAXES

Commencing on the Rent Commencement Date, Tenant's Fixed Share of Taxes shall be in the amount per square foot of Premises GLA set forth in the Total Tax Due ($/SF) column for the corresponding Tax Year in the table below, payable in equal monthly installments in advance.

| Tax Year | | | Total Tax Due ($/SF) |
|---|---|---|---|
| 2/1/2014 | - | 1/31/2015 | $5.36 |
| 2/1/2015 | - | 1/31/2016 | $5.61 |
| 2/1/2016 | - | 1/31/2017 | $5.87 |
| 2/1/2017 | - | 1/31/2018 | $6.17 |
| 2/1/2018 | - | 1/31/2019 | $6.48 |
| 2/1/2019 | - | 1/31/2020 | $6.82 |
| 2/1/2020 | - | 1/31/2021 | $7.17 |
| 2/1/2021 | - | 1/31/2022 | $7.55 |
| 2/1/2022 | - | 1/31/2023 | $7.97 |
| 2/1/2023 | - | 1/31/2024 | $8.43 |
| 2/1/2024 | - | 1/31/2025 | $8.91 |
| 2/1/2025 | - | 1/31/2026 | $9.43 |
| 2/1/2026 | - | 1/31/2027 | $10.00 |
| 2/1/2027 | - | 1/31/2028 | $10.59 |
| 2/1/2028 | - | 1/31/2029 | $11.23 |
| 2/1/2029 | - | 1/31/2030 | $11.91 |